**COMMUNITY FOR CREATIVE NON-VIOLENCE, et al.,**
**Appellees,**

v.

**Carmen TURNER, Appellant.**

**No. 89-7120.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 20, 1989.

Decided Jan. 26, 1990.

Linda Lazarus, with whom Gerald J. Stief, Robert J. Kniaz, Robert L. Polk, and Bruce P. Heppen were on the brief for the appellant.

Andrew T. Karron, with whom Maureen E. McGirr, and Arthur B. Spitzer were on the brief for appellees.

Before MIKVA, EDWARDS, and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

Opinion concurring in the judgment filed by Circuit Judge WILLIAMS.

MIKVA, Circuit Judge:

The Washington Metropolitan Area Transit Authority ("WMATA") promulgated a regulation (the "Regulation") governing the use of WMATA property by those wishing to engage in free speech activities. The trial court determined that certain provisions of the Regulation were facially violative of the first amendment and thus invalid. In particular, the trial court invalidated the provisions that require those who wish to engage in free speech activities to obtain a permit, empower WMATA to modify or rescind the permit under certain specified conditions, allow WMATA to set the maximum number of persons who may engage in free speech activities on a station-by-station basis, and prohibit certain forms of expression.

For the reasons expressed below, we affirm the trial court's decision to invalidate the Regulation's permit requirement and the provisions allowing WMATA to establish the maximum number of people who

may engage in free speech activities in each station, empowering WMATA to suspend or modify a permit, and requiring that free speech activities be carried out in a "conversational tone." We reverse the trial court's decision to strike the provisions banning chanting, dancing, shouting, outcries, and the use of musical instruments and voice amplification devices, and we remand for development of the factual record necessary to evaluate the constitutionality of these restrictions.

## I

On January 15, 1987, WMATA adopted the Regulation to govern "the organized exercise of rights and privileges which deal with political, religious, or social matters and are non-commercial." The Regulation requires those wishing to engage in these free speech activities to obtain a permit by mail or in person from the WMATA central business office during normal business hours. The Regulation also provides for the enforcement of its restrictions under applicable local criminal laws and ordinances.

In a separate consolidated criminal action, appellees Snyder, Fennelly, and other members of Community for Creative Non–Violence ("CCNV") were arrested and prosecuted for allegedly violating the Regulation. Superior Court Judge Hamilton dismissed the case on the grounds that the Regulation was facially overbroad and thus violative of the first amendment.

Appellees subsequently filed a complaint charging that the Regulation contravened the first, fifth, and fourteenth amendments to the Constitution. The parties filed cross-motions for summary judgment. On May 17, 1989, Judge Sporkin issued a Memorandum Opinion and Order granting the appellees' motion for partial summary judgment and invalidating the entire Regulation. 714 F.Supp. 29. On May 19, 1989, the trial court issued an Amended and Substituted Order superseding the May 17, 1989 order and granting in part the appellees' motion for partial summary judgment. —— F.Supp. ——.

The trial court's Amended Order invalidated the following provisions of the Regulation:

Section 100.10 *Free Speech Activities*

. . . .

(b) *Permit.* All individuals and groups requesting permission to engage in free speech activities on WMATA property must first submit and have approved the permit request in accordance with Section 100.2, permits.

(c) *Modification and Suspension.* All free speech permits are subject to modification and suspension as a result of or in the event of any emergencies such as snow storms, traffic accidents, power failures, transportation strikes; or on the day of the observance of national holidays; or other conditions which may affect the traffic flow in the area covered by free speech activities creating a dangerous condition or substantially interfering with the general public.

. . . .

(e) *Number of Individuals.* The number of persons permitted to engage in free speech activities at each Metro Station will be designated on a station-by-station basis.

. . . .

(g) *Prohibitions.* Free speech activities are to take place in a conversational tone and at no time shall such activities include chanting, dancing, shouting, outcries, or the use of any device for voice amplification or any other sound device including musical instruments.

## II

A. *The Permit Requirement*

■ The trial court determined that the Regulation's permit requirement, § 100.10(b), constitutes an unconstitutional prior restraint on the exercise of first amendment rights. Because § 100.10(b) requires that any party who wishes to engage in free speech activities on WMATA property must first obtain a permit from the Office of General Counsel, it is a prior

restraint, as it gives " 'public officials the power to deny use of a forum in advance of actual expression.' " *Ward v. Rock Against Racism,* —— U.S. ——, 109 S.Ct. 2746, 2756 n. 5, 105 L.Ed.2d 661 (1989) (quoting *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1976)). The Supreme Court has consistently indicated that a system of prior restraint comes to a court "bearing a heavy burden against its constitutional validity." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70 n. 10, 83 S.Ct. 631, 639 n. 10, 9 L.Ed.2d 584 (1963). The Court has also noted, however, that prior restraints are not *per se* invalid. A prior restraint may be constitutional if attended by procedural safeguards designed "to obviate the dangers of a censorship system." *Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965). To this end, the Court has required the regulating body to provide "narrow, objective, and definite standards to guide the licensing authority" and ensure a content-neutral determination. *Shuttlesworth v. Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969).

In accord with these precedents, this court has indicated that reasonable time, place, and manner restrictions are an exception to the general prohibition against prior restraints. *See Lebron v. WMATA,* 749 F.2d 893, 896 (D.C.Cir.1984). This court has also stated that

> it is common ground that *appropriate* permit systems are permissible under the First Amendment.... A permit system is an embodiment of time, place, and manner restrictions that have long enjoyed the approbation of the Supreme Court.

*Kroll v. United States Capitol Police,* 847 F.2d 899 (D.C.Cir.1988), *modified on reh'g,* No. 83–2014 (Jan. 19, 1989) (emphasis added).

■ The standard for reviewing time, place, and manner restrictions on expression protected by the first amendment depends on the nature of the forum being regulated. If it is a "public forum," the Supreme Court has held that the regulation must be content-neutral, narrowly tailored to serve a significant governmental interest, and allow for sufficient alternative channels of communication. *See Rock Against Racism,* 109 S.Ct. at 2753. If the proposed forum for expression is not a public forum, the regulation will be upheld as long as the restrictions are reasonable and are not directed at opposing the views of particular individuals. *See Adderley v. Florida,* 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1986).

Courts that have addressed the public forum question have determined that a property may become a public forum in two ways. First, courts have tended to characterize as a public forum property that resembles streets and parks because such property historically has been devoted to the exchange of free ideas. *See, e.g., United States v. Grace,* 461 U.S. 171, 179, 103 S.Ct. 1702, 1708, 75 L.Ed.2d 736 (1982) (sidewalks surrounding the Supreme Court grounds); *see also U.S. Southwest Africa/Namibia Trade & Cultural Council v. United States,* 708 F.2d 760, 763–66 (D.C. Cir.1983) (discussing the factors that support "public forum" status). Second, in *Cornelius v. NAACP Legal Defense and Educational Fund,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), the Court stated that it

> has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum. The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent.

*Id.* at 802, 105 S.Ct. at 3449; *see Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (state university created public forum for students' use by express policy of making its meeting facilities available for their use); *Madison Joint School Dist. v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (state statute providing for open school board meetings created public forum); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (municipal auditorium

and city-leased theater were public fora because they were designed for and dedicated to expressive activities).

In contrast, the Court has refused to find a designated public forum where there is clear evidence of contrary intent or the nature of the regulated property is inconsistent with free speech activity. *See, e.g., Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (school district's internal mail system is not a public forum); *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (advertising areas on city buses were not public fora because city intended to limit access to advertising space); *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (military base is not a public forum because principal function of property would be disrupted by expressive activity); *Adderley v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (same justification for holding that prisons are not public fora).

 Under the foregoing standards, the above-ground free areas of the WMATA stations are public fora, either in traditional terms or by designation. To the extent that this property is indistinguishable from the public sidewalks, it constitutes a traditional public forum under *Grace.* Alternatively, the above-ground free areas are designated public fora because, by promulgating the Regulation and its predecessor regulation, WMATA has indicated an intent to open these areas to a wide range of free speech activities.

The fact that the Regulation attempts to limit the time, place, and manner of this expression does not alter this conclusion. WMATA's arguments to the contrary are somewhat puzzling. WMATA contends that, at most, the above-ground free areas are public fora dedicated to a specific use and thus are not open to the public at large. The terms of the Regulation belie this assertion, however, because they do not purport to limit permits to certain groups or individuals. Rather, any group may engage in very broadly defined free speech activities in the above-ground free areas so long as they obtain a permit—which, WMATA has vehemently argued, may be denied only for safety-related reasons. Thus, WMATA's reliance on cases that have recognized the government's right to limit access to a forum to select groups or purposes is misplaced. Significantly, the Supreme Court's language in *Cornelius* suggests that where, as here, "the granting of the requisite permit is merely ministerial," and not attended by "extensive admission criteria to limit access ... to those organizations considered appropriate," the regulator's claim of selective access would fail. 473 U.S. at 804–05, 105 S.Ct. at 3450–51; *accord Perry,* 460 U.S. at 47, 103 S.Ct. at 956.

As noted above, because the above-ground free areas are public fora, the permit requirement can survive constitutional scrutiny only if it is content-neutral, narrowly tailored to achieve a significant government objective, and leaves open ample alternative channels for communication. *See Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984).

### 1. *Content–Neutrality*

 We accept WMATA's contention that the permit requirement is content-neutral because it is "justified without reference to the content of the regulated speech." *Clark,* 468 U.S. at 293, 104 S.Ct. at 3069. WMATA offers several justifications for the permit requirement: promoting safety, ensuring that WMATA property is used for transportation purposes, and providing equal access to WMATA facilities for all members of the public desiring to express their views. Each of these is grounded in concerns independent of content.

### 2. *Narrow Tailoring*

It is clear that the interests that WMATA intends to serve through the permit requirement are significant. *See Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 650, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981) ("As a general matter, it is clear that a State's

interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective."); *Grayned v. City of Rockford,* 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972) (same); *Cox v. New Hampshire,* 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941) (same). Our focus under this prong of the inquiry must be on the extent to which the permit requirement is narrowly tailored to achieve these interests. In *Rock Against Racism,* the Supreme Court recently clarified the "narrowly tailored" standard:

> Lest any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate content-neutral interests but that it need not be the least-restrictive or least-intrusive means of doing so.

109 S.Ct. at 2757–58. Instead, the Court indicated that "the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* at 2758 (quoting *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985)).

The Court constricted the foregoing standard somewhat by stating that "this standard does not mean that a time, place, or manner restriction may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* In upholding New York City's regulation governing the use of a Central Park bandshell, the Court noted that

> [t]he guideline does not ban all concerts, or even all rock concerts, but instead focuses on the source of the evils the city seeks to eliminate—excessive and inadequate sound amplification—and eliminates them without at the same time banning or significantly restricting a substantial quantity of speech that does

not create the same evils. This is the essence of narrow tailoring.

*Id.* 109 S.Ct. at 2758 n. 7.

WMATA's permit requirement fails the "narrow tailoring" inquiry. Although WMATA's stated interests are achieved *more effectively* with the regulation than without it, the permit requirement also restricts many incidents of free expression that pose little or no threat to WMATA's ability to provide safe and efficient transportation and an equitably available forum for public expression. By definition, the permit requirement applies to "the organized exercise of rights and privileges which deal with political, religious, or social matters and are non-commercial." Despite WMATA's attempt to provide a viable limiting construction for this provision, it is unclear what free speech activities would not be covered by the permit requirement. The meaning of "organized" is at best vague. It is unclear why an individual's decision to wear a political button or a tee-shirt bearing a slogan would not be an "organized" free speech activity requiring a permit. Even assuming that we read "organized" to mean two or more individuals speaking or otherwise proselytizing in the above-ground area of a Metro station, it is clear that many of these activities would not interfere meaningfully with WMATA's asserted interests. Nonetheless, as written, the Regulation requires a permit for all such free speech activities. This provides a striking contrast to the bandshell guideline upheld in *Rock Against Racism.* While the Regulation arguably eliminates the "sources of evil" that allegedly threaten WMATA's ability to provide a safe and efficient transportation system, it does so at too high a cost, namely, by significantly restricting a substantial quantity of speech that does not impede WMATA's permissible goals.

Because the failure to satisfy any prong of the test invalidates a regulation, our conclusion that the permit requirement is not "narrowly tailored" is dispositive. Nonetheless, for the sake of completeness we will briefly consider the availability of alternative channels of expression under the permit requirement.

### 3. *Alternative Channels of Expression*

In considering whether a regulation leaves open ample alternative channels of communication, the Court has generally upheld regulations which merely limit expressive activity to a specific part of the regulated area or to a limited time frame. Thus, in *Clark v. Community for Creative Non-Violence*, the Court determined that a regulation banning sleeping in Lafayette Park left open sufficient alternative means of communicating certain demonstrators' concern about the plight of the homeless, as the challenged regulation did allow the demonstrators to remain on the property with their "symbolic city, signs, and the presence of those who were willing to take their turns in a day-and-night vigil." 468 U.S. at 295, 104 S.Ct. at 3070. In *Frisby v. Schultz*, the Court construed an ordinance prohibiting "picketing before or about the residence or dwelling of any individual in the Town of Brookfield" as allowing protestors to express their message by marching through the streets of a neighborhood so long as they did not stop and direct their picketing at a particular residence. 487 U.S. 474, 108 S.Ct. 2495, 2501, 101 L.Ed.2d 420 (1988). Thus, the Court concluded that the challenged ordinance allowed protestors ample alternative means to express their views. *Id.* Most recently, in *Rock Against Racism*, the Court determined that New York City's bandshell guideline satisfied this criterion because "the guideline continues to permit expressive activity in the Bandshell, and has no effect on the quantity or content of that expression beyond regulating the extent of amplification." 109 S.Ct. at 2760.

In contrast with the foregoing restrictions, WMATA's permit requirement *completely* excludes those desiring to engage in organized free speech activity from the above-ground free areas of WMATA property unless they have a permit. There are no WMATA areas not covered by the permit requirement. Persons desiring to engage in *any* organized free speech activities in the WMATA forum are subject to the permit requirement; it does not regulate only the volume, location, or duration of such expression. There is no intra-forum alternative.

We affirm the trial court's decision to invalidate the permit requirement. In so doing, however, we acknowledge that WMATA is charged with providing safe and efficient transportation for almost 500,000 passengers daily and must be able to ensure that these passengers are able to reach its stations with as little risk as possible. WMATA must be able to regulate to some extent the expressive activities that occur in and around its stations. A narrowly tailored permitting scheme—one that reasonably identifies particular expressive conduct for which a permit is required—is an entirely appropriate tool. The existing permit requirement attempts to achieve this goal but sweeps too widely, burdening substantially more speech than is necessary to guarantee WMATA's safe and efficient operation. Although it is not our province to design an appropriate regulation, we cannot give effect to regulatory efforts that tread unnecessarily on first amendment guarantees.

### B. *The Other Restrictions*

While we are unquestionably bound to strike down legislative and administrative enactments that impermissibly burden constitutional rights, the Supreme Court has articulated repeatedly that this exercise should be, to the extent practicable, surgically precise. Thus, we adhere to the " 'elementary principle that the same statute may be in part constitutional and in part unconstitutional, and that if the parts are wholly independent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected.' " *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985) (quoting *Allen v. Louisiana*, 103 U.S. 80, 83–84, 26 L.Ed. 318 (1881)).

Applying the foregoing approach, our decision to affirm the trial court's invalidation of the permit requirement does not require an automatic carryover invalidation of the rest of the Regulation. We must determine whether the Regulation's other provi-

sions are severable from the permit requirement. Our inquiry does not end simply because the Regulation contains no severability clause. The Supreme Court has held that "the ultimate determination of severability will rarely turn on the presence or absence" of such a clause. *United States v. Jackson*, 390 U.S. 570, 585 n. 27, 88 S.Ct. 1209, 1218 n. 27, 20 L.Ed.2d 138 (1968). In assessing severability, we must contemplate whether WMATA would have enacted the other challenged provisions in the absence of a permit requirement. *See Brockett*, 472 U.S. at 506 n. 15, 105 S.Ct. at 2803 n. 15; *see also Gary v. United States*, 499 A.2d 815, 821–22 (D.C.1985), *cert. denied*, 475 U.S. 1086, 106 S.Ct. 1470, 89 L.Ed.2d 725 (1986). In such an inquiry, the presumption is always in favor of severability. *See Regan v. Time*, 468 U.S. 641, 653, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984); *Gary*, 499 A.2d at 822.

Obviously, WMATA would not have enacted § 100.10(c), governing modification and suspension of permits, absent the permit requirement. Therefore, this provision is not severable from the § 100.10(b) permit requirement. Because we affirm the trial court's decision to strike § 100.10(b), we likewise affirm the invalidation of § 100.10(c). To aid in the redrafting of the permit provision, we note that on its own § 100.10(c) is unobjectionable constitutionally. Assuming that WMATA redrafts the permit requirement in a manner that does not burden substantially more speech than is necessary to achieve its legitimate goals, § 100.10(c) could be readopted in its existing form.

Given its stated goals, WMATA would almost certainly have enacted the remaining provisions, §§ 100.10(e) and 100.10(g), even in the absence of the permit requirement. Section 100.10 of the Regulation is entitled "Free Speech Activities." "Free speech activity" is defined in § 100.7 as "the organized exercise of rights and privileges which deal with political, religious, or social matters and are noncommercial." It is inconceivable that WMATA would forego all regulation of these activities if it were unable to implement a permit system. WMATA would still have desired to estab-

lish a maximum number of individuals who could engage in free speech activity at each station and would have desired limitations on dancing, chanting, shouting, and the use of musical instruments whether or not it required a permit for such activity. The permit requirement is merely a subset of the category of restrictions on free speech activities. The other provisions, with the exception of § 100.10(c) as noted above, are not contingent upon the permit requirement for their existence and viability. Because these provisions are severable from § 100.10(b), we examine their constitutionality independently.

### 1. *Section 100.10(e)*

■ Section 100.10(e) provides: "The number of persons permitted to engage in free speech activities at each Metro Station will be designated on a station-by-station basis." This restriction fails for the same reason as the permit requirement. Given the Regulation's extremely broad definition of free speech activities, § 100.10(e) could be used, for example, to ban more than one or two individuals wearing a tee-shirt bearing a political slogan from moving simultaneously through the above-ground areas of the Metro. Because this would burden substantially more speech than necessary to further WMATA's legitimate safety objectives, § 100.10(e) is not a reasonable time, place, or manner restriction. We affirm the district court's decision to strike this provision.

### 2. *Section 100.10(g)*

The trial court invalidated the portion of § 100.10(g) that reads as follows:

Free speech activities are to take place in a conversational tone and at no time shall such activities include chanting, dancing, shouting, outcries, or the use of any device for voice amplification or any other sound device including musical instruments.

■ a. *Conversational Tone.* We agree with the trial court that the "conversational tone" standard is too vague to survive. The Supreme Court has indicated

that "[t]he general test of vagueness applies with particular force in review of laws dealing with speech." *Hynes v. Mayor of Oradell,* 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976). In *Smith v. California,* 361 U.S. 147, 151, 80 S.Ct. 215, 217, 4 L.Ed.2d 205 (1959), the Court said:

[S]tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser.

By restricting permissible free speech activities to those conducted in a "conversational tone," WMATA has created a classically vague restriction, replete with the dangers at which the void-for-vagueness doctrine has been aimed. The lack of precision would give those enforcing this prohibition an impermissibly wide discretionary range in which to determine who is in violation. More importantly, the standard would likely chill legitimate exercises of free speech, as a person "of common intelligence must necessarily guess at its meaning." *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

WMATA responds to the trial court's invalidation of this provision by arguing that, even if the court found the "conversational tone" language to be overbroad or vague, it should have adopted a narrowing construction of the terms rather than invalidating the provision. In support of this position, WMATA cites cases from the Supreme Court and this court which hold that a reviewing court must read a challenged regulation in a common-sense manner and not require semantic precision. *See Rock Against Racism,* 109 S.Ct. at 2755 ("[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.") (citing *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972); *Kovacs v. Cooper,* 336 U.S. 77, 79,

69 S.Ct. 448, 449, 93 L.Ed. 513 (1949)); *Juluke v. Hodel,* 811 F.2d 1553, 1560–61 (D.C.Cir.1987). We do not see how a court could reasonably provide a narrowing construction of "conversational tone" that would obviate the problems noted above. The vagaries which this prohibition generates are so patent and mischievous that this language provides no standard at all. That a court's construction might winnow down the parade of horribles does not salvage the provision. If WMATA cannot be more precise as to what additional speaking styles it desires to regulate, it should not try to prescribe the tone of the speaker.

█ b. *The Remaining Prohibitions.* Unlike the "conversational tone" standard—which is constitutionally infirm on any set of facts—the remaining prohibitions in § 100.10(g) might pass constitutional muster under certain circumstances. Under the analysis outlined above, if the prohibitions at issue did not burden significantly more speech than necessary to further WMATA's legitimate safety objectives, the restrictions would be constitutional. Whether the prohibitions are sufficiently narrowly tailored depends upon such material facts as the extent and character of the open space at each of WMATA's stations and the nexus between the restrictions and WMATA's stated goals. Because the trial judge struck down the restrictions in a summary judgment, his ruling may be upheld only if there is no genuine dispute as to these material facts. Fed.R.Civ.P. 56(c). A review of the parties' pleadings reveals that WMATA and CCNV disagree strongly about a number of these crucial issues. *Compare* Complaint for Declaratory and Injunctive Relief, ¶ 33 *with* Answer of Carmen Turner as General Manager of the Washington Metropolitan Transit Authority, ¶ 33 (disputing whether enforcement of the Regulation is necessary to further WMATA's safety interests); and *compare* Plaintiffs' Rule 108(h) Statement of Material Facts Not in Dispute, ¶ 14 *with* Defendant's Statement of Material Facts as to Which There Is a Genuine Issue in Opposition to Plaintiffs' Motion for Summary Judgment, ¶ 14 (disputing the extent

and character of the open space surrounding certain Metro stations). The trial judge did not resolve these factual disputes. Indeed, the judge provided no specific reasons for striking the prohibitions; he included them in the injunction only after the parties requested a clarification of the order. Therefore, we reverse the trial court's decision to strike the prohibition of dancing, chanting, shouting, outcries, and the use of musical instruments and sound amplification devices; we remand for further factual development of these issues.

## CONCLUSION

Appellees urge us to affirm the trial court's decision to invalidate a substantial portion of the Regulation. The line between wholesale invalidation and the more selective review that we have given the Regulation's provisions obviously is thin. But a reviewing court must not wield the Constitution as a bludgeon to crowd policymakers out of making their decisions altogether. It is for WMATA to decide how it wishes to complete its regulatory scheme. The court ought not, and has not, raised any barriers to WMATA's ability to further the safety and convenience of its passengers—it is the Constitution that requires WMATA to revisit the drawing board to craft more precise means to these ends.

STEPHEN F. WILLIAMS, Circuit Judge, concurring in the judgment:

I concur in the court's invalidation of WMATA's requirement of a permit for any "free speech" activity, but believe the result can be reached by a far easier path, without getting into the thicket of "public forum" jurisprudence. As to the other restrictions on First Amendment activity, I agree with the majority that these need to be remanded to the district court, although I would also remand the "conversational tone" restriction.

## I. The Permit Requirement

The Washington Metropolitan Area Transit Authority requires a permit for all "free speech activities" in the above-ground areas of its stations. Regulations Concerning the Use By Others of The Washington Metropolitan Area Transit Authority Property ("WMATA Regulations"), § 100.10(b). It defines "free speech activit[y]" as "the organized exercise of rights and privileges which deal with political, religious, or social matters and are noncommercial." *Id.* at § 100.7(h). Under the Supreme Court's decision in *Board of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987), invalidating a ban on all "First Amendment activities" within Los Angeles International Airport, the permit system cannot stand.

The differences between the two sets of regulations do not justify a different outcome. The WMATA regulation's scope is slightly narrower, as it applies only to the *"organized* exercise of rights...." WMATA suggests that therefore it covers only "persons who are engaged in a plan or pattern of conduct that is intended to propagate a point of view on political, religious, or social matters to bystanders." WMATA Reply Brief at 18. But limiting the permit requirement to those who proselytize still leaves it applicable to much of the sort of conduct that persuaded the Court to find the Los Angeles regulation facially overbroad, such as "the wearing of a T-shirt or button that contains a political message." See 482 U.S. at 576, 107 S.Ct. at 2573. While WMATA might invoke the adjective "organized" to exclude the lone actor from coverage (thus allowing the lone wearer of a T-shirt or button), it makes no claim that solos are exempt; for instance, it asserts (and strenuously defends) coverage of a lone protester with a placard.

Second, WMATA has imposed only a license requirement, not an outright ban. But this is not enough to save it. Just as the Court in *Board of Airport Comm'rs* found that "no conceivable governmental

interest would justify such an absolute prohibition" of nondisruptive speech, *id.* at 575, 107 S.Ct. at 2572, there can be none that would justify requiring the lone button wearer to go to WMATA's office for a permit. Accordingly, here as there, the regulation must be found overbroad regardless of whether the areas covered are any kind of a public forum.

WMATA, as had the airport in *Board of Airport Comm'rs*, started from the wrong end of the problem. Instead of identifying problem conduct, it started with the entire universe of free speech activity and then applied some limitations. As a result, it swept up far more speech than posed any real concern.

Unnecessarily, the majority embarks on an application of the several public forum categories—"traditional public forum," "designated public forum," and government property that is not a public forum at all. While these play a role in constitutional assessment of *content*-based restrictions, see, e.g., *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983), they are of "limited utility" for evaluating time, place, and manner regulations. *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 815 n. 32, 104 S.Ct. 2118, 2134 n. 32, 80 L.Ed.2d 772 (1984). In each of the three categories limits of time, place, and manner must be reasonable. See *Perry*, 460 U.S. at 45–46, 103 S.Ct. at 954–55. Restrictions qualify as such if they "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* at 45, 103 S.Ct. at 955. The first requirement is merely definitional, excluding content-based restrictions. The substantive standards, expressed as the second and third prongs, are applied in every forum. See, e.g., *Clark v. CCNV*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) (applying test in Lafayette Park, a traditional public forum); *Heffron v. Int'l Soc. for Krishna Consc.*, 452 U.S. 640, 647–48, 655, 101 S.Ct. 2559, 2563–64, 2567, 69 L.Ed.2d 298 (1981) (applying test in a "limited public forum"); *Taxpayers for Vincent*, 466 U.S. at 808, 812, 813–15, 104 S.Ct. at 2130, 2132, 2133 (applying test despite finding that property was not a public forum); *Gannett Satellite Inf. Net. v. Metro Transp. Auth.*, 745 F.2d 767, 772–73 (2nd Cir.1984) (applying three-part test after finding public areas of MTA stations not to be public forum); *United States v. Bjerke*, 796 F.2d 643, 650–51 (3rd Cir.1986) (upholding regulation that "reasonably advances the governmental interest" and leaves open "alternative areas ... for communication" after holding post office walkways not to be public forum); cf. *Hale v. Department of Energy*, 806 F.2d 910, 916–17 (9th Cir.1986) (holding nuclear test site not public forum and finding regulation reasonable in light of safety and national security interests and because of existence of alternative channels of communication); but see *United States v. Belsky*, 799 F.2d 1485, 1489 (11th Cir.1986).[1] See also Daniel A. Farber and John E. Nowak, *The Misleading Nature of Public Forum Analysis: Content and Context in First Amendment Adjudication*, 70 Va.L. Rev. 1219, 1239 (1984) ("Essentially the same test applies to all content neutral regulations regardless of the nature of the forum, as the Court's opinion in [*Taxpayers for Vincent*] indicates."); but see Geoffrey R. Stone, *Content–Neutral Restrictions*, 54 U.Chi.L.Rev. 46, 90 (1987) ("it seems clear to me that the Court does indeed apply different standards of review to public forums and nonpublic forums.").[2]

1. The *Belsky* decision suggests that the reasonableness test is weaker in areas that are not a public forum, primarily in omitting any least-restrictive-alternative analysis. But in fact no such analysis is applied even in a public forum. See *Ward v. Rock Against Racism*, — U.S. —, 109 S.Ct. 2746, 2757–58, 105 L.Ed.2d 661 (1989).

2. Dean Stone points to the different outcomes, for example, in *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (invalidating ban of displays of flags, etc. on sidewalk surrounding Supreme Court), and *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (upholding ban of political speeches on military base), but the specific governmental interests at stake—preserving the appearance of impartiality of the Court versus maintaining security and morale on a military base—were

Parenthetically, I note that even if the test for time, place and manner restrictions varied perceptibly as between forum types, the cases do not suggest that the typology has served the purpose of helpfully structuring analysis of such restrictions. First, the decisions allocating spaces among the categories are not easily reconciled. See, for example, *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (advertising spaces on interior of buses are not public forum); *Gannett Satellite Inf. Net. v. Metro Transp. Auth.*, 745 F.2d at 773 (public areas of MTA stations are not public forum); *Moskowitz v. Cullman*, 432 F.Supp. 1263, 1266 (D.N.J.1977) (PATH subway stations are public forum); cf. *Lebron v. WMATA*, 749 F.2d 893, 896 (D.C.Cir.1984) (advertising spaces in subway were converted into designated public forum by subway's acceptance of political advertising). See also *U.S. S.W. Africa/Namibia Trade & Cult. Coun. v. U.S.*, 708 F.2d 760, 764–66 (D.C. Cir.1983) (display areas in National and Dulles airports are public forum); *Jamison v. City of St. Louis*, 828 F.2d 1280, 1283 (8th Cir.1987) (collecting cases holding airports to be public forums); Note, *Public Forum Analysis after* Perry Education Association v. Perry Local Educators' Association, 54 Ford.L.Rev. 545, 548 (1986) (collecting cases dealing with other governmental properties).

Second, once made, the classification does not seem to clearly determine the outcome. Either formulation of the substantive standard—whether the three-part reasonableness test for public forums or the allegedly less stringent one for nonforums—involves a rather open-ended balancing of factors. Thus, agreement that a space is, for example, a traditional public forum does not produce consistent results. Compare *United States v. Kokinda*, 866 F.2d 699 (4th Cir.1989) (holding post office sidewalks are public forums and striking down prohibition on soliciting contributions), cert. granted, —— U.S. ——, 110 S.Ct. 47, 107 L.Ed.2d 16 (1989), with *National Anti–Drug Coalition, Inc. v. Bolger*, 737 F.2d 717 (7th Cir.1984) (assuming that post office sidewalks are public fo-

rums but upholding same regulation). Moreover, in striking the reasonableness balance courts inevitably reweigh the very factors that decided the public forum issue in the first place. Compare *Kokinda*, 866 F.2d at 702–03 with *id.* at 704, and *Bjerke*, 796 F.2d at 649 with *id.* at 650, 651.

In fact, the evaluation of time, place and manner restrictions at any location is basically an assessment of the compatibility of the forbidden speech with the government's interests in the space. "The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972); see also *Wright v. Chief of Transit Police*, 558 F.2d 67, 68 n. 1 (2nd Cir.1977) ("Whether or not a particular forum is a 'public forum' akin to a public street is merely a variant of the 'compelling interest' test."); cf. *Greer v. Spock*, 424 U.S. 828, 843, 96 S.Ct. 1211, 1220, 47 L.Ed.2d 505 (1976) (Powell, J., concurring) (content-based restriction should be judged on whether excluded speech is incompatible with government's interest in area); *id.* at 859–60, 96 S.Ct. at 1227–28 (Brennan, J., dissenting) (similar). Judicial review can fully reflect the details of context without use of the public forum categories. See, for example, the analyses of time, place and manner restrictions in *Heffron*, 452 U.S. at 649–55, 101 S.Ct. at 2564–68; *Clark v. CCNV*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); *White House Vigil for the ERA Committee v. Clark*, 746 F.2d 1518 (D.C.Cir.1984).

The unnecessary confusion deepens when a court (as here) applies the *"designated"* public forum doctrine to time, place and manner restrictions. That doctrine operates usefully as a kind of equal protection doctrine for free speech: once the government opens a forum, it cannot exclude speech because of its content without "compelling" reasons. See, e.g., *Widmar v. Vincent*, 454 U.S. 263, 268, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981) (university that provides space to accommodate meetings of student groups may not ex-

radically different in the two cases and seem an

ample explanation of the outcomes.

clude on basis of content of intended speech in absence of compelling state interest); but see *Cornelius v. NAACP Legal Defense and Educational Fund*, 473 U.S. 788, 803–06, 105 S.Ct. 3439, 3449–51, 87 L.Ed.2d 567 (1985) (government reservation of discretionary content-based control over access indicates lack of intent to designate as public forum). Not surprisingly, every Supreme Court and D.C. Circuit case that has invoked the designated public forum doctrine to strike down a regulation has involved content-based restrictions. See *Widmar; Madison School District v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 175, 97 S.Ct. 421, 426, 50 L.Ed.2d 376 (1976) (school teachers who wish to discuss controversial labor relations issues may not be excluded from school board meetings); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975) (public theater, which was a "public forum designed for and dedicated to expressive activities," could not veto performance of the musical "Hair" without meeting heavy burden of justification); *Lebron v. WMATA*, 749 F.2d 893 (D.C.Cir.1984) (WMATA could not refuse particular political advertisement when it had accepted other political advertising in the past).

But time, place, and manner restrictions call for no such heightened scrutiny. Among the oddities of the court's analysis here is that it invokes WMATA's forebearance from any ad hoc content-based restrictions as a basis for imposing a stricter test on its time, place and manner rules. Maj.Op. at 1391. WMATA should not depart from this litigation sorry for ever having opened its premises to speech without discrimination as to content. Such a result would "deter officials from making generous concessions" to accommodate free expression, *Knolls Action Project v. Knolls Atomic Power Lab.*, 771 F.2d 46, 49 (2nd Cir.1985), and would ill serve the First Amendment.

If it were necessary to determine whether the ground-level areas of WMATA's sta-

tions were a "designated" public forum, circuit precedent would require a set of factual findings that the majority skips. In *Stewart v. District of Columbia Armory Board*, 863 F.2d 1013 (D.C.Cir.1988), this court held that the question of whether RFK Stadium was a designated public forum could not be decided "in the absence of a factual record." *Id.* at 1018. As the court noted, "[t]he forum doctrine itself is not a taxonomy of ideal types; it is virtually impossible in most cases to identify a public forum by legal inquiry alone, confined to the intrinsic nature of government actions or purposes." *Id.* See also *Searcey v. Crim*, 815 F.2d 1389, 1392 (11th Cir.1987); *National Anti–Drug Coalition, Inc. v. Bolger*, 737 F.2d 717, 722–23 (7th Cir.1984). In *Stewart*, accordingly, we required findings as to the primary purpose of the government in operating the property, the compatibility of that purpose with expressive activity, and any consistent pattern of such activity on the property. 863 F.2d at 1019.

Here neither the judge below nor the majority makes any such findings. The only material facts found by the district judge were "the existence of the WMATA Regulation and the applicability of that Regulation." *CCNV v. Turner*, 714 F.Supp. 29, 32 (D.D.C.1989).[3] Even the Plaintiff's Statement of Material Facts Not In Dispute does not address the *Stewart* factors. The majority's conclusion on the designated public forum issue is supported only by the bare assertion that "by promulgating the Regulation and its predecessor regulation, WMATA has indicated an intent to open these areas to a wide range of free speech activities." Maj.Op. at 1391. Indeed, if the designated public forum finding has in fact affected the majority's decision, WMATA's imposition of time, place and manner restrictions is invalid either because it failed to enact more severe time, place and manner restrictions, or, perhaps more startling, because it failed to make content-based choices among groups or individuals. See *id.*

---

**3.** The district judge did not make the findings required by *Stewart* because he relied on *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (holding the public side-

walks around the Supreme Court to be a traditional public forum), and held that the above ground areas of WMATA are traditional public forums. *CCNV*, 714 F.Supp. at 32.

A final note on the disposition of the permit requirement. I believe the majority also errs in looking only to the regulated area for alternative channels of communication. *Id.* at 1393. For example the majority weighs against the regulation the facts that "[t]here are no WMATA areas not covered by the permit," and that "[t]here is no intra-forum alternative." *Id.* The Supreme Court takes a broader view. In examining restrictions on public fairgrounds, for example, it looked to the entire area outside the grounds ("anywhere"). *Heffron*, 452 U.S. at 654–55, 101 S.Ct. at 2567–68; see also *National Anti-Drug Coalition, Inc.* 737 F.2d at 727–28 (looking to "municipal sidewalks surrounding and/or adjacent to postal property" as an alternative channel of communication). Restricting the inquiry to "intra-forum" alternatives represents a new and unjustified limitation on the alternative channels test. As with the public forum issue, moreover, there is no need to address the question of alternative channels, for the permit requirement is both fatally overbroad under *Board of Airport Comm'rs* and (the same thing in different words) defective for want of "narrow tailoring" under the test for time, place and manner restrictions.

## II. Other Regulations

I largely agree with the majority's disposition on the other regulations. Section 100.10(e), which limits "the number of persons," must fall for the same reason as the permit requirement, although again my reasoning would follow *Board of Airport Comm'rs.* With respect to the prohibitions found in § 100.10(g), I concur in the majority's remand to the district court to develop a better factual record, but would include in the remand the ban on communications not in a "conversational tone." While vagueness claims are often conceived as pure issues of law, they are not wholly so, as is made clear by the Court's decision in *Grayned v. City of Rockford*, 408 U.S. 104, 111–12, 92 S.Ct. 2294, 2300–01, 33 L.Ed.2d 222 (1972), upholding a ban on "making a noise or diversion that disturbs or tends to disturb the peace or good order" of a school session, and relying on the school

context. Moreover, the parties have not briefed the issue. Certainly some limiting constructions of the "conversational tone" clause are possible, even compelled. It surely prohibits only expressions in volumes *exceeding* a conversational tone; i.e., it does not prohibit whispers. Cf. *id.* (relying on state court interpretation that ban was limited to *imminent* threats to peace or good order). Thus, to secure the benefit of the fact-gathering that is in any event necessary for review of the other clauses, and the parties' assistance on such legal issues as the proper construction, I would remand this issue as well.

\* \* \*

Accordingly, I concur in the judgment that WMATA's permit system violates the First Amendment and in the remand to the district court.