# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 13, 2010          Decided August 6, 2010

No. 09-5176

MICHAEL BOARDLEY,
APPELLANT

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-01986)

---

*Nathan W. Kellum* argued the cause for appellant. With him on the briefs was *Heather G. Hacker*. *Jordan W. Lorence* entered an appearance.

*Robin M. Meriweather*, Assistant U.S. Attorney, argued the cause for appellees. With her on the brief were *Ronald C. Machen, Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: SENTELLE, *Chief Judge*, BROWN and KAVANAUGH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: It is unlawful to engage in expressive activities within any of this country's 391 national parks unless a park official first issues a permit authorizing the activity. Michael Boardley argues this licensing scheme is overbroad and therefore unconstitutional on its face. We agree. The regulations in their current form are antithetical to the core First Amendment principle that restrictions on free speech in a public forum may be valid only if narrowly tailored. Because these regulations penalize a substantial amount of speech that does not impinge on the government's interests, we find them overbroad and therefore reverse the district court.

I

In 1916, Congress created the National Park Service (NPS), within the Department of the Interior, to "promote and regulate the use of the Federal areas known as national parks, monuments, and reservations . . . by such means and measures as conform to the fundamental purpose . . . to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. The Secretary of the Interior was authorized to "make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks . . . and any violation of any of the rules and regulations authorized by this section . . . shall be punished by a fine of not more than $500

or imprisonment for not exceeding six months, or both." *Id.* § 3.

The two regulations challenged here govern "[p]ublic assemblies, meetings," 36 C.F.R. § 2.51, and the "[s]ale or distribution of printed matter," *id.* § 2.52, within the national parks. Both regulations are substantially the same. First, they call for the designation of what the government calls "free speech areas." *See* Appellees' Br. at 15. Subsections (e) require park superintendents to "designate on a map, [which] shall be available for inspection in the office of the superintendent," the locations in the park available for public assemblies or the distribution of printed matter. 36 C.F.R. §§ 2.51(e), 2.52(e). "Locations may be designated as not available only if" expressive activities would injure or damage park resources, "[u]nreasonably impair the atmosphere of peace and tranquility maintained in wilderness, natural, historic or commemorative zones," interfere with programmatic or administrative activities, substantially impair the operation of public facilities or services, or "[p]resent a clear and present danger to the public health and safety." *Id.*

Second, the regulations prohibit "[p]ublic assemblies, meetings, gatherings, demonstrations, parades and other public expressions of views" and "[t]he sale or distribution of [non-commercial] printed matter" within park areas, unless "a permit [authorizing the activity] has been issued by the superintendent." *Id.* §§ 2.51(a), 2.52(a). An application for a permit must include the applicant's name; the name of his or her organization (if any); the date, time, duration, and location of the proposed event or distribution; an estimate of the number of participants; and a statement of the equipment and facilities to be used. *Id.* §§ 2.51(b), 2.52(b). The regulations require the superintendent to issue a permit "without unreasonable delay" unless a prior application for the same

time and place has been (or will be) granted; the event is of a nature or duration that it cannot reasonably be accommodated without damaging the park or interfering with, or impairing, other programs or facilities; or it "reasonably appears that the event will present a clear and present danger to the public health or safety." *Id.* §§ 2.51(c), 2.52(c).[1] Finally, "[i]f a permit is denied, the applicant shall be so informed in writing, with the reason(s) for the denial set forth." *Id.* §§ 2.51(d), 2.52(d). In sum, the NPS regulations erect two layers of restrictions on speech in national parks: first, they confine specified expressive activities to "free speech areas"; and second, they require a permit to be obtained before engaging in such activities, whether in a "free speech area" or elsewhere.

II

In 2007, appellant Michael Boardley and some associates attempted to distribute free tracts discussing the Gospel of Jesus Christ within a "free speech area" of Mount Rushmore National Memorial. A park ranger stopped them because they lacked a permit. Boardley returned home, requested a permit by phone, but never received a permit or an application. He then filed this action, seeking a declaration that the NPS regulations are unconstitutional and violative of the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1, on

---

[1] Section 2.52 includes two additional grounds for denying a permit: "The location applied for has not been designated as available for the sale or distribution of printed matter" or "[t]he activity would constitute a violation of an applicable law or regulation." 36 C.F.R. § 2.52(c).

their face and as applied to him.[2] Shortly thereafter, he received the permit he had requested.

The district court dismissed Boardley's as-applied claims on grounds of mootness and failure to state a claim. *Boardley v. U.S. Dep't of Interior*, 605 F. Supp. 2d 8, 13–14 (D.D.C. 2009). We summarily affirmed the dismissal of these as-applied challenges. *Boardley v. U.S. Dep't of Interior*, Nos. 09-5176, 09-5186, 2009 WL 3571278, at *1 (D.C. Cir. Oct. 19, 2009) (per curiam).

However, the district court agreed with Boardley that 36 C.F.R. § 2.51(a) was facially unconstitutional to the extent that it required park visitors to obtain a permit before engaging in "other public expressions of views." *Boardley*, 605 F. Supp. 2d at 15–16. But the court held that this provision was severable from the overall regulation, and concluded the remainder of 36 C.F.R. §§ 2.51 and 2.52 was facially valid. *Id.* at 16–19. The court therefore granted in

---

[2] The record does not disclose whether Boardley was ordered to obtain a "[p]ublic assemblies, meetings" permit, 36 C.F.R. § 2.51, or a permit for the "[s]ale or distribution of printed matter," *id.* § 2.52. *See* Compl. ¶ 26 (referring generally to a "free speech permit"). Conceivably, Boardley ran afoul of both regulations because he engaged in the "distribution of printed matter" by handing out the gospel tracts, 36 C.F.R. § 2.52(a), and participated in a "[p]ublic assembl[y], meeting[], [or] gathering[]" by congregating with his associates in the same location of the park to convey his religious views, *id.* § 2.51(a). In addition, Boardley alleges that he and at least one of his associates "desire[] to return to Mt. Rushmore to exercise [their] First Amendment rights . . . ." Compl. ¶ 41; *see id.* ¶ 55. In any event, the government has not argued that Boardley lacks standing to challenge either of these regulations, and we conclude such an argument would be without merit.

part and denied in part both Boardley's and the government's motions for summary judgment. *Id.* at 19–20. Both parties appealed, but the government voluntarily dismissed its appeal. *See Boardley v. U.S. Dep't of Interior*, No. 09-5186, 2010 WL 1255986, at *1 (D.C. Cir. Mar. 5, 2010). Thus, the sole issue before us is whether the NPS regulations—excluding the provision in § 2.51 regarding "other public expressions of views"—are facially unconstitutional under the First Amendment.

We review the district court's determination *de novo*. *See Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).

III

The First Amendment provides, "Congress shall make no law . . . abridging the freedom of speech." Boardley claims the NPS regulations are unconstitutional on their face. "It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992). The Supreme Court has explained that "[t]his exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court. Thus, . . . a party [may] challenge an ordinance under the overbreadth doctrine in cases where every application creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker, and in cases where the ordinance sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected." *Id.* at 129–30 (citations omitted).

Claims under the Free Speech Clause of the First Amendment are analyzed in three steps: First, "we must . . . decide whether [the activity at issue] is speech protected by the First Amendment, for, if it is not, we need go no further." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). Second, assuming the activity "is protected speech, we must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Id.* And third, we must assess whether the government's justifications for restricting speech in the relevant forum "satisfy the requisite standard." *Id.* In this case, the first step requires no lengthy discussion. The activities prohibited in the absence of a permit by the NPS regulations are unquestionably "speech" within the meaning of the First Amendment. *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 161 (2002) (finding "hand distribution of religious tracts" to be protected speech) (internal quotation marks omitted); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 568 (1995) ("Parades are . . . a form of expression, not just motion."). The NPS regulations clearly implicate the First Amendment; the question is whether they violate it.

A

"Even protected speech is not equally permissible in all places and at all times. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius*, 473 U.S. at 799–800. Rather, the extent of scrutiny given to a regulation of

speech—in effect, how we examine the directness with which it promotes the government's goals and the degree to which it burdens speech—depends on whether the regulation applies in a *public* or *nonpublic* forum. "Traditional public fora are those places which by long tradition or by government fiat have been devoted to assembly and debate." *Id.* at 802 (internal quotation marks omitted). Another type of public forum is the "designated public forum," which exists when "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." *Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1132 (2009). A nonpublic forum is by contradistinction "[p]ublic property which is not by tradition or designation a forum for public communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

Boardley contends all national parks are traditional public forums. As support for this proposition, he argues the Supreme Court repeatedly has stated that "parks" are quintessential examples of traditional public forums. This premise is unassailable, *see, e.g.*, *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, No. 08-1371, slip op. at 12 n.11 (U.S. June 28, 2010) (referring to "traditional public forums, such as . . . parks"); *Pleasant Grove City*, 129 S. Ct. at 1129 (noting "a park is a traditional public forum"), but Boardley's conclusion does not follow. The protections of the First Amendment do not rise or fall depending on the characterization ascribed to a forum by the government. Mount Rushmore does not become a public forum merely by being called a "national park" any more than it would be transformed into a nonpublic forum if it were labeled a "museum." The dispositive question is not what the forum is *called*, but what *purpose* it serves, either by tradition or specific designation. What makes a park a traditional public forum is not its grass and trees, but the fact that it has

"immemorially been held in trust for the use of the public and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n*, 460 U.S. at 45 (internal quotation marks omitted); *cf. United States v. Kokinda*, 497 U.S. 720, 727 (1990) (plurality) (cautioning that "[t]he mere physical characteristics of the property cannot dictate forum analysis" and holding that sidewalk abutting a Post Office was not a public forum). Thus, to establish that a national park (in whole or part) is a traditional public forum, Boardley must show that, like a typical municipal park, it has been held open by the government for the purpose of public discourse.

The record before this court is woefully inadequate to determine the forum status of the hundreds of national parks governed by the NPS regulations. Common sense tells us they are not all identical. *See United States v. Doe*, 968 F.2d 86, 90 (D.C. Cir. 1992) ("Th[e] [First Amendment] test . . . must be applied in a realistic manner which takes into account the nature and traditional uses of the particular park involved. Lafayette Park is not Okefenokee National Wildlife Refuge, even if both are under the Park Service's supervision."). Presumably, many national parks include areas—even large areas, such as a vast wilderness preserve—which never have been dedicated to free expression and public assembly, would be clearly incompatible with such use, and would therefore be classified as nonpublic forums. But at the same time, many national parks undoubtedly include areas that meet the definition of traditional public forums. *See, e.g.*, *ISKCON of Potomac, Inc. v. Kennedy*, 61 F.3d 949, 954 (D.C. Cir. 1995) ("The Park Service concedes, as it must, that the Mall is a traditional public forum for purposes of the First Amendment."). This is a fact-intensive question which cannot be answered in the absence of evidentiary submissions. "As heretofore emphasized, the decision as to

whether a forum is public usually invokes a factual inquiry. The forum doctrine itself is not a taxonomy of ideal types; it is virtually impossible in most cases to identify a public forum by legal inquiry alone." *Stewart v. Dist. of Columbia Armory Bd.*, 863 F.2d 1013, 1018 (D.C. Cir. 1988) (remanding to district court to develop a factual record on forum status). Yet, the record on this appeal gives no hint as to the history and tradition, or lack thereof, of expressive activities in the various national parks.

Fortunately, we have a basis for resolving this appeal without deciding the forum status of all 391 national parks. The government concedes the "free speech areas" made available within national parks pursuant to subsections (e) of the NPS regulations are "designated public forums." *See* Appellees' Br. at 15–16; *see also* 36 C.F.R. §§ 2.51(e), 2.52(e). These areas are subject to the same permit requirement as all other locations within the national parks. *See* 36 C.F.R. §§ 2.51(a), 2.52(a) (prohibiting specified expressive activities in the absence of a permit anywhere in a national park). Thus, at least with respect to these "free speech areas," the NPS regulations must be analyzed as restrictions on speech in public forums, and we need not (indeed, cannot) decide whether the same analysis would apply to the diverse range of other areas within the national parks.[3] Having determined that the NPS regulations target

---

[3] Of course, some or all of these "free speech areas" might be traditional public forums anyway. In accepting the government's concession that these areas are designated public forums, we do not imply that if they had not been so designated they would be nonpublic forums, or that the government can simply revoke their designation and thereby alter their forum status. Nor do we suggest that these are the only public forums within the national parks; they are simply the only ones cognizable on the sparse record before us.

protected "speech," and that these restrictions apply in public forums, we proceed to consider whether they "satisfy the requisite standard." *Cornelius*, 473 U.S. at 797.

B

"[T]he core abuse against which [the First Amendment] was directed was the scheme of licensing laws implemented by the monarch and Parliament to contain the 'evils' of the printing press in 16th- and 17-century England." *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 320 (2002). Thus, "[a]ny system of prior restraints of expression . . . bear[s] a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). Regulatory schemes "conditioning expression on a licensing body's prior approval of content 'present[] peculiar dangers to constitutionally protected speech'" and require "extraordinary procedural safeguards" in order to survive constitutional scrutiny. *Thomas*, 534 U.S. at 321, 323 (quoting *Freedman v. Maryland*, 380 U.S. 51, 57 (1965)). However, "a content-neutral permit scheme regulating speech in a public forum . . . differs *toto coelo*" from a "licensing standard which gives an official authority to censor the content of a speech." *Id.* at 322 (internal quotation marks omitted). Because "[r]egulations of the use of a public forum that ensure the safety and convenience of the people" do not raise the same kinds of "censorship concerns" as content-based prior restraints, their presumption of invalidity is more easily rebutted. *Id.* at 323.

Thus, in assessing the constitutionality of a prior restraint, it must be determined at the outset whether the regulation is content-based or content-neutral. This determination is critical, not because it might end the inquiry, but because it will direct its path. Here, the NPS regulations

are indisputably content-neutral on their face. They prohibit certain forms of expressive conduct—public assemblies, meetings, gatherings, demonstrations, parades, and the sale or distribution of printed matter—in the absence of a permit, regardless of the message the speaker wishes to convey. 36 C.F.R. §§ 2.51(a), 2.52(a). Nor is there any evidence the NPS was motivated to adopt these regulations by its agreement with or hostility toward any particular message or speaker. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994).

Content-neutral restrictions on the time, place, or manner of speech in a public forum are analyzed under a familiar multipart test: First, the regulations may not delegate overly broad licensing discretion to a government official. Second, the scheme must be narrowly tailored to serve a significant governmental interest. And third, it must leave open ample alternatives for communication. *See Forsyth County*, 505 U.S. at 130.[4]

1

Even a content-neutral licensing scheme may raise significant censorship concerns if it vests government officials with unrestricted freedom to decide who qualifies for a permit and who does not. "It is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit

---

[4] The scheme also "must not be based on the content of the message," *id.*, but of course this requirement is satisfied since the content-neutrality of the regulations is the precondition that led us to the time, place, or manner test in the first place.

to do so." *Watchtower Bible*, 536 U.S. at 165–66. Thus, such schemes must "contain adequate standards to guide the official's decision and render it subject to effective judicial review," thereby eliminating the "risk that he will favor or disfavor speech based on its content." *Thomas*, 534 U.S. at 323. *Compare id.* at 324 (upholding scheme that provided several "reasonably specific and objective" grounds for denying a permit and did "not leave the decision to the whim of the administrator") (internal quotation marks omitted), *with Forsyth County*, 505 U.S. at 133 (striking down scheme that contained "no articulated standards" and did "not require[] . . . rel[iance] on any objective factors"), *and City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 769 (1988) (plurality) (striking down licensing scheme that allowed officials to subject permit applications to "such other terms and conditions deemed necessary and reasonable by the Mayor" because "the face of the ordinance itself contain[ed] no explicit limits on the mayor's discretion").

Boardley argues the NPS regulations vest government officials with overly broad discretion, allowing a permit to be denied if "[i]t reasonably appears that the event will present a clear and present danger to the public health or safety." 36 C.F.R. §§ 2.51(c)(2), 2.52(c)(2). Before the Supreme Court's decision in *Thomas*, this argument might have been plausible. But in *Thomas*, the Court upheld a licensing scheme for Chicago parks that allowed a permit to be denied if the intended activity "would present an unreasonable danger to [public] health or safety." *Thomas*, 534 U.S. at 318 n.1, 324. Boardley distinguishes the NPS regulations because they allow NPS officials to decide whether the proposed event "reasonably appears" to present a public danger, as opposed to deciding simply whether the event "would present" such danger. *See* Tr. of Oral Arg. at 12–17. If this is indeed a distinction, it is one wholly without constitutional

significance. An official tasked with forecasting whether a proposed event might endanger the health or safety of the public must necessarily make a predictive judgment based on the facts as she knows them and her expertise in the field. Few licensing schemes would survive constitutional scrutiny if certainty were a prerequisite. It is not fatal to the NPS regulations that they endow park officials with some measure of discretion. The "clear and present danger" standard is sufficiently unambiguous and objective to guard against the possibility of it serving as a backdoor artifice for content-based censorship. Of course, a future as-applied challenge could argue that the NPS's denial of a permit on "clear and present danger" grounds was, in fact, pretext for content-based discrimination. But *Thomas* forecloses this argument as a facial matter.

Next, Boardley contends the NPS regulations vest park officials with overly broad discretion because—although they require permits to be granted or denied "without unreasonable delay"—they set no specific time period. Most circuits have held content-neutral licensing schemes need not contain explicit timeframes for processing permit applications. *See H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 624 (6th Cir. 2009) (rejecting argument "that content-neutral licensing ordinances [must] contain a brief, specified time limit"); *S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1138 (9th Cir. 2004) ("Because it is content-neutral, the Act need not contain . . . a deadline for consideration by the governing body."); *Granite State Outdoor Adver., Inc. v. City of St. Petersburg*, 348 F.3d 1278, 1282 n.6 (11th Cir. 2003) ("[W]e . . . hold time limits are not *per se* required when the licensing scheme at issue is content-neutral."); *Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1328 (Fed. Cir. 2002) (same). These courts relied on *Thomas*'s holding that content-neutral licensing schemes need not contain the

"extraordinary procedural safeguards" imposed on content-based schemes. *Thomas*, 534 U.S. at 323. *Compare Freedman*, 380 U.S. at 59 (holding that licensing schemes must contain a "specified brief period" for officials to decide whether or not to issue a permit), *with Thomas*, 534 U.S. at 322–23 (explaining that *Freedman* applies only to content-based censorship regimes).

Boardley focuses on *United States v. Frandsen*, where the Eleventh Circuit held one of the NPS regulations at issue here (36 C.F.R. § 2.51) to be unconstitutional because the "without unreasonable delay" standard "fail[ed] adequately to confine the time within which the decision maker must act." 212 F.3d 1231, 1240 (11th Cir. 2000). But this decision lacks persuasive force for two reasons: first, it relied on *Freedman* and predated the Supreme Court's decision in *Thomas*, which clarified that *Freedman* does not apply to content-neutral schemes; and second, the Eleventh Circuit itself declined to follow *Frandsen* in its post-*Thomas* decision in *Granite State Outdoor Advertising*, cited above. Boardley points us to no post-*Thomas* decision holding that a content-neutral licensing scheme must contain an explicit timeframe for official action in order to withstand constitutional scrutiny.

We find that the "without unreasonable delay" standard is "adequate . . . to guide [a park] official's decision and render it subject to effective judicial review." *Thomas*, 534 U.S. at 323. For one, this standard places the NPS regulations on significantly firmer ground than the licensing schemes upheld by other circuits, which contained no timeliness standard at all. It also takes into account the fact that not all applications can, or should, be processed with equal speed; what constitutes "unreasonable delay" could vary depending on such factors as the complexity of the application and the

resources of the park to which it is directed.[5] In any event, as the district court found, all national parks "appear to have" adopted "short and definite deadlines" of "between three and ten days." *Boardley*, 605 F. Supp. 2d at 17. Given that the scheme upheld in *Thomas* required applications to be processed within fourteen days (and could be extended an additional fourteen days), *see* 534 U.S. at 318, we have no trouble finding deadlines between three and ten days to be reasonable. This case does not require us to proclaim what the outer limit might be. Lastly, we are sensitive to Boardley's concern that park officials could engage in content-based discrimination by "sit[ting] on a speaker's application without granting or denying it and without explaining the basis for delay." Appellant's Br. at 43. But while this sort of abuse likely would form the basis of a successful as-applied challenge, here we need not go beyond the regulations' facial requirements to speculate about hypothetical cases.

2

Boardley argues the NPS regulations are not a narrowly tailored means of achieving the government's substantial interests. A content-neutral time, place, or manner regulation is narrowly tailored "so long as the . . . regulation promotes a

---

[5] The government points us to a memorandum from the Director of the Department of the Interior to the Regional Directors and Superintendents of the national parks. It states, "NPS Management Policies ¶ 8.6.3 (2006) . . . provides that a permit request under 36 CFR § 2.51 will be issued or denied within two business days after receipt of a proper application." Oddly, the actual Management Policies do not appear to be part of our record. It is unclear what effect, if any, park superintendents have given to this memorandum, and we therefore decline to rely on it.

substantial government interest that would be achieved less effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (internal quotation marks omitted). But while the regulation "need not be the least restrictive or least intrusive means," the regulation may not "burden substantially more speech than is necessary" to achieve the government's substantial interests. *Id.* at 798–99; *see also Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (noting that a content-neutral ordinance banning picketing in front of private residences "is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy"); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986) (upholding a content-neutral zoning ordinance because it was "'narrowly tailored' to affect only that category of [adult] theaters shown to produce the unwanted secondary effects"). Although a content-neutral restriction will not be struck down "simply because there is some imaginable alternative that might be less burdensome on speech," *Ward*, 491 U.S. at 797 (internal quotation marks omitted), the existence of "numerous and obvious less-burdensome alternatives . . . is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable," *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993). Thus, "the court must closely scrutinize the regulation to determine if it indeed promotes the Government's purposes in more than a speculative way." *Cmty. for Creative Non-Violence v. Kerrigan*, 865 F.2d 382, 390 (D.C. Cir. 1989).

The government asserts the NPS regulations further its interests in "protect[ing] the national parks' natural and cultural resources; protect[ing] park facilities and property from damage; ensur[ing] that locations are not populated beyond their capacity; protect[ing] visitors to the parks; avoid[ing] interference with the parks' activities and the

operation of park facilities; and preserv[ing] peace and tranquility in the parks." Appellees' Br. at 25. Boardley does not appear to question the substantiality of these interests, and indeed, he would have little basis for doing so. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 296 (1984) (finding a "substantial interest in maintaining the parks in [D.C.] in an attractive and intact condition"); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981) ("[I]t is clear that [the government's] interest in protecting the safety and convenience of persons using a public forum is a valid governmental objective") (internal quotation marks omitted); *Henderson v. Lujan*, 964 F.2d 1179, 1184 (D.C. Cir. 1992) (finding a "substantial interest . . . [in] promot[ing] an atmosphere of calm, tranquility and reverence in the vicinity of" a war memorial) (internal quotation marks omitted); *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984) ("[T]he government has a substantial interest in the preservation and enhancement of the human environment; aesthetics are a proper focus of governmental regulation.") (footnote omitted).

Boardley argues the NPS regulations are not narrowly tailored to the advancement of these interests because the permit requirement applies not only to large groups, but also to small groups and even lone individuals. His argument draws considerable support from this and other circuits. The Sixth Circuit, for instance, has found that "[p]ermit schemes and advance notice requirements that potentially apply to small groups are nearly always overly broad and lack narrow tailoring." *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005) (striking down licensing scheme for public parades because the city's "significant interest in crowd and traffic control, property maintenance, and protection of the public welfare is not advanced by the application of the [o]rdinance to small

groups"). The Fourth Circuit reached the same conclusion in *Cox v. City of Charleston*, where a lone protestor challenged an ordinance barring "any person" from participating in "any parade, meeting, exhibition, assembly or procession . . . on the streets or sidewalks of the city" without a permit. 416 F.3d 281, 283 (4th Cir. 2005) (internal quotation marks omitted). The court held that the "application of the [o]rdinance to groups as small as two or three renders it constitutionally infirm" because the city failed to "establish[] why burdening such expression is necessary to facilitate its interest in keeping its streets and sidewalks safe, orderly, and accessible." *Id.* at 285–86. The Ninth Circuit relied on similar grounds in striking down an ordinance requiring street performers at a public park to obtain permits before performing. *See Berger v. City of Seattle*, 569 F.3d 1029, 1035 (9th Cir. 2009) (en banc). The court explained:

> [T]he Supreme Court has consistently struck down permitting systems that apply to individual speakers—as opposed to large groups—in the . . . context [of] solicitation of private homes. . . . Although the Supreme Court has not addressed the validity of single-speaker permitting requirements for speech in a public forum, it stands to reason that such requirements would be at least as constitutionally suspect when applied to speech in a public park, where a speaker's First Amendment protections reach their zenith, than when applied to speech on a citizen's doorstep, where substantial privacy interests exist. It is therefore not surprising that we and almost every other circuit to have considered the issue have refused to uphold registration

> requirements that apply to individual speakers
> or small groups in a public forum.

*Id.* at 1038–39 (citations omitted); *see also Knowles v. City of Waco*, 462 F.3d 430, 436 (5th Cir. 2006) ("Other circuits have held, and we concur, that ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest.").

Our own precedent points in the same direction. In *Community for Creative Non-Violence v. Turner*, we held unconstitutional a Washington Metropolitan Area Transit Authority (WMATA) regulation requiring individuals to obtain permits before engaging in "free speech activities" within subway stations. 893 F.2d 1387, 1388 (D.C. Cir. 1990). After finding that the stations were public forums, we held the "permit requirement fails the 'narrow tailoring' inquiry." *Id.* at 1392. We agreed WMATA's interest in promoting safe and convenient access to transportation was substantial, but concluded the permit requirement swept too broadly: "While the [r]egulation arguably eliminates the 'sources of evil' that allegedly threaten WMATA's ability to provide a safe and efficient transportation system, it does so at too high a cost, namely, by significantly restricting a substantial quantity of speech that does not impede [its] permissible goals." *Id.* A crucial problem with the regulation was that it applied to groups of all sizes, even when "two or more individuals speaking or otherwise proselytizing . . . would not interfere meaningfully with WMATA's asserted interests." *Id.*

We are not persuaded by the district court's attempt to distinguish these cases on the ground that the NPS regulations at issue here

do not cover city streets, or subway entrances, or the local public park; they cover places of immense historical significance . . . and great natural beauty . . . . Unlike people walking in the city center or entering the subway, visitors to a national park expect a peaceful and tranquil environment, and the government has a legitimate interest in providing that experience to them. Even a small demonstration, or a lone pamphleteer, can disrupt that experience, particularly in some of the smaller parks.

*Boardley*, 605 F. Supp. 2d at 18 (citations omitted). This analysis amounts to an argument that the national parks are not public forums. But as discussed above, without deciding the forum status of every part of every national park, it is at least clear that the locations designated as "free speech areas" pursuant to subsections (e) of the regulations are public forums. *See* 36 C.F.R. §§ 2.51(e), 2.52(e). Therefore, by definition, these are not areas where the government has a paramount interest in maintaining a "peaceful and tranquil environment," *Boardley*, 605 F. Supp. 2d at 18. *See Doe*, 968 F.2d at 89 (rejecting governmental interest in tranquility at Lafayette Park and noting that "the very concept of a situs being designated as a 'public forum' for First Amendment purposes presupposes that the situs has been used for purposes of assembly, communicating thoughts between citizens and discussing public questions") (internal quotation marks omitted). In fact, the NPS regulations expressly provide that park superintendents may decline to designate a location as a "free speech area" if expressive activities would "[u]nreasonably impair the atmosphere of peace and tranquility maintained in wilderness, natural, historic or

commemorative zones." 36 C.F.R. §§ 2.51(e)(2), 2.52(e)(2).[6] Thus, within "free speech areas," the government has exceedingly little basis for hushing "lone pamphleteer[s]," *Boardley*, 605 F. Supp. 2d at 18, in the name of peace and tranquility.

Nor are the remainder of the government's interests substantially furthered by imposing the licensing requirement on small groups and individuals. Restrictions on free speech must "promote[] the Government's purposes in more than a speculative way." *Cmty. for Creative Non-Violence*, 865 F.2d at 390. It is not sufficient that a "regulation . . . contributes marginally to [the government's] interest." *Id.* The government asserts interests in preventing overcrowding, protecting park facilities, protecting visitors, and avoiding interference with park activities. *See* Appellees' Br. at 25. But why are individuals and members of small groups who speak their minds more likely to cause overcrowding, damage park property, harm visitors, or interfere with park programs than people who prefer to keep quiet? *See Lederman v. United States*, 291 F.3d 36, 45 (D.C. Cir. 2002) ("'Freedom of expression . . . would rest on a soft foundation indeed if government could distinguish' between demonstrators and pedestrians on 'a wholesale and categorical basis,' without providing evidence that demonstrators pose a greater risk to identified government interests than do pedestrians.") (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 101

---

[6] We note that Boardley raises no challenge to subsections (e) of the NPS regulations. 36 C.F.R. §§ 2.51(e), 2.52(e). In other words, he does not argue that it is unconstitutional to confine specified expressive activities to "free speech areas" and does not challenge the grounds provided for declining to designate a location as a "free speech area." Rather, he attacks only the permit requirement. *Id.* §§ 2.51(a), 2.52(a).

(1972)). We fail to see why an individual's desire to be communicative is a strong proxy for the likelihood that she will pose a threat to park security or accessibility. No doubt *some* individuals and small groups will cause these problems, but many will not; and the government has not explained why those engaged in free expression are more likely to be problematic than anyone else. "[T]he Constitution does not tolerate regulations that, while serving their purported aims, prohibit a wide range of activities that do not interfere with the Government's objectives." *Id.* at 44 (internal quotation marks omitted).

The fit between means and ends is far more precise when the NPS regulations are applied to large groups. The most important function of a permit application is to provide park officials with the forewarning necessary to coordinate multiple events, assemble proper security, and direct groups to a place and time where interference with park visitors and programs will be minimized. These needs arise routinely with large-scale events, but only rarely with small ones. For example, the government argues that it requires advance notice to determine whether to summon a Special Events and Tactical Team (SETT). Appellees' Br. at 36. But according to the Chief Park Ranger for Mount Rushmore National Memorial, SETTs are "[m]ost often" deployed for "major events" such as "large scale demonstrations; presidential, other VIP, or dignitary visits; major disasters; special ceremonies requiring crowd control; special law enforcement investigations and emergency law enforcement operations." Third Decl. of Mike Pflaum ¶ 24. Similarly, the NPS's "potential need to arrange for additional parking, traffic control, sanitary facilities, water fountains, and/or first aid stations," Appellees' Br. at 36–37, will arise much more frequently when a large group plans to hold an event than when a few people wish to speak freely or hand out

pamphlets. Imposing the permit requirement on individuals and small groups promotes the government's need for forewarning only marginally, if at all.

To be sure, the government suggests examples of small groups that "can attract a significant crowd or otherwise strain the resources of a park"—such as the "Westboro Baptist Church," a "neo-Nazi white supremacist group," or a "small group of Ku Klux Klan members." *Id.* at 41–42. But the government has failed to show that *most* individuals and small groups who engage in free speech pose such problems. In order to be narrowly tailored, the regulations must "target[] and eliminate[] no more than the exact source of the 'evil' [they] seek to remedy." *Frisby*, 487 U.S. at 485; *see Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1307–08 (D.C. Cir. 2005) (holding that ban on signature solicitation on Postal Service sidewalks was not narrowly tailored because "the problems the government identifies arise only occasionally" and "much solicitation . . . is not disruptive"). The NPS regulations target much more than necessary. If a Girl Scouts leader musters her scouts onto a pavilion in a "free speech area" of Glacier National Park and proceeds to lecture them about the effects of global warming, she will have conducted both a "meeting" and a "gathering" (perhaps also an "assembly") for which a permit would have been required. 36 C.F.R. § 2.51(a). An elementary school teacher who leads eight students on an excursion to the Canyon de Chelly National Monument and, within a "free speech area," shows off her best imitation of a traditional Navajo dance presumably has hosted an unlawful "demonstration." *Id.* If a believer in Creationism visits the Hagerman Fossil Beds National Monument and, within a "free speech area," quietly hands out literature disputing the theory of evolution, he is guilty of "distribut[ing] . . . printed matter" without a permit. *Id.* § 2.52(a). Under a plain reading

of the NPS regulations, all of this speech is banned unless a permit is first acquired, even though none of it remotely threatens any of the government's interests. Thus, it is not dispositive that there may be a few circumstances in which the permit requirement could validly be applied to small groups. Even if application of the permit requirement to individuals and small groups "arguably eliminates [some] 'sources of evil' that allegedly threaten" the government's various interests, "it does so at too high a cost, namely, by significantly restricting a substantial quantity of speech that does not impede [the NPS's] permissible goals." *Turner*, 893 F.2d at 1392.

Our conclusion is reinforced by the fact that the NPS regulations are far more burdensome when applied to individuals and small groups than when applied to large groups. For one, the permit requirement effectively forbids spontaneous speech. *See Watchtower Bible*, 536 U.S. at 167–68. Large groups, of course, generally cannot speak spontaneously. Obligating a large group to apply for a permit simply creates one more step in the already-lengthy process of planning a large-scale event. Individuals and small groups, by contrast, frequently wish to speak off the cuff, in response to unexpected events or unforeseen stimuli. For example, if an individual comes upon a (duly licensed) antiwar protest at a national park and wishes to don a "support the troops" pin in response, must he first apply for a permit or otherwise risk being penalized for engaging in an unlicensed "demonstration"? *See* 36 C.F.R. § 2.51(a). This is a major deprivation of free speech, and it falls almost exclusively on individuals and small groups. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring) ("[W]hen an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all.").

Secondly, the permit requirement infringes on individuals' ability to engage in anonymous speech. A speaker's "decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995). This is not to say that the government never can establish a justification for mandating the disclosure of identifying information, *see, e.g.*, *Doe v. Reed*, No. 09-559, slip op. at 8–10 (U.S. June 24, 2010),[7] but only that the burden of such disclosure falls harder on individuals and small groups than on large groups. Whereas members of large groups easily can remain anonymous—except, perhaps, for the leader who fills out the permit application—a lone individual has no choice but to put her own name on the application. Moreover, common experience reveals that large groups tend to seek as much publicity as possible; anonymity is more often prized by those operating outside an organized group. In sum, the permit requirement imposes substantial burdens on individuals and small groups—burdens which the government has failed to justify. Because "the means chosen are . . . substantially broader than necessary to achieve the government's interest," *Ward*, 491 U.S. at 800, the NPS regulations are overbroad and not narrowly tailored.

Finally, we note that the government has myriad less intrusive means of achieving its interests. *See City of*

---

[7] Indeed, as Boardley recognizes, *see* Appellant's Br. at 34–35, with respect to large groups, the limited disclosure required by the NPS regulations is justified by the government's substantial need to engage in communication with group leaders—to coordinate the timing and location of multiple events, to ensure adequate security is in place, and to assess financial responsibility for damage and other incidental expenses.

*Cincinnati*, 507 U.S. at 417 n.13 (noting that the existence of "numerous and obvious less-burdensome alternatives . . . is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable"). It could, for example, promulgate separate regulations for different national parks, taking into account the vast differences in the sizes and uses of the various parks. Instead of subjecting individuals and small groups to a prior restraint on speech, the NPS could simply prohibit and punish conduct that harasses park visitors, interferes with official programs, or creates security or accessibility hazards. Or, rather than employing an identical prior restraint on speech no matter where it occurs in a park, the NPS could craft distinct regulations for wilderness areas, visitors centers, parking lots, and so forth. Whether any of these options would withstand constitutional scrutiny depends on the specifics, but they all surely would be more narrowly tailored than the all-encompassing regulations at hand.

3

Finally, a time, place, or manner regulation must "leave open ample alternatives for communication." *Forsyth County*, 505 U.S. at 130. These alternatives must exist "'within the forum in question.'" *Initiative & Referendum Inst.*, 417 F.3d at 1310 (quoting *Heffron*, 452 U.S. at 655). Thus, we can easily reject the government's argument that this requirement is satisfied because "[i]ndividuals can distribute pamphlets or engage in permitless demonstrations on *other* property *near*" the national parks. Appellees' Br. at 44 (emphasis added). "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Reno v. ACLU*, 521 U.S. 844, 880 (1997) (internal quotation marks omitted). This case is analogous to *Turner*, where we held

that WMATA's licensing scheme for speech in subway stations failed to leave open ample alternatives for communication:

> [The] permit requirement *completely* excludes those desiring to engage in organized free speech activity . . . unless they have a permit. There are no [subway station] areas not covered by the permit requirement. Persons desiring to engage in *any* organized free speech activities in the . . . forum are subject to the permit requirement; it does not regulate only the volume, location, or duration of such expression. There is no intra-forum alternative.

893 F.2d at 1393.

These same problems plague the NPS regulations. As the government conceded at oral argument, for someone who wishes to distribute leaflets in a national park, there is no lawful alternative to a permit. Tr. of Oral Arg. at 30–31. The same is true for those desiring to host an assembly, meeting, gathering, demonstration, or parade. *See* 36 C.F.R. § 2.51(a). Given the breadth of these proscriptions, virtually anyone engaging in any permitless expressive activity in a national park risks a penalty. Thus, the NPS regulations not only lack narrow tailoring, they fail to leave open ample intra-forum alternatives for communication.

IV

Requiring individuals and small groups to obtain permits before engaging in expressive activities within designated "free speech areas" (and other public forums within national

parks) violates the First Amendment. Neither party has argued that we should sever the regulations in order to leave part of them intact, and we perceive no basis for doing so. And, of course, it is the prerogative of the agency (or Congress) to decide whether to rewrite the regulations to apply only to large groups, and to decide where to draw that line. We have no choice but to hold the regulations unconstitutional in their entirety. Accordingly, the judgment of the district court is

*Reversed.*