Merrimack
No. 2011-420

JONATHAN DOYLE

v.

COMMISSIONER, NEW HAMPSHIRE DEPARTMENT OF RESOURCES AND ECONOMIC DEVELOPMENT & a.

Argued: November 10, 2011
Opinion Issued: January 13, 2012

216

*NH Civil Liberties Union Foundation*, of Concord (*Barbara R. Keshen* on the brief and orally), and *Backus, Meyer and Branch, LLP*, of Manchester (*Jon Meyer* on the brief), for the plaintiff.

*Michael A. Delaney*, attorney general (*Matthew G. Mavrogeorge*, assistant attorney general, on the brief and orally), for the defendants.

DUGGAN, J. The plaintiff, Jonathan Doyle, appeals an order of the Superior Court (*Smukler*, J.) granting summary judgment to the defendants, the Commissioner of the New Hampshire Department of Resources and Economic Development and the Monadnock State Park Manager (collectively, DRED), and denying Doyle's motion for summary judgment. We reverse and remand.

The record supports the following facts. Mount Monadnock is a 3,165-foot mountain within Monadnock State Park, which is owned and managed by DRED. With 100-mile views to points in all six New England states, Mount Monadnock is said to be the second most climbed mountain in the world. Aside from hiking the mountain, visitors to Monadnock State Park may camp, picnic, Nordic ski and snowshoe. Mount Monadnock has been designated a National Natural Landmark.

On September 6, 2009, Doyle decided to film himself dressed as "Bigfoot" on Mount Monadnock. Bigfoot, also known as Sasquatch, is "a large, hairy humanlike creature believed by some persons to exist in the northwestern United States and western Canada." 10 THE NEW ENCYCLOPEDIA BRITANNICA 464 (15th ed. 2010). "The British explorer David Thompson is sometimes credited with the first discovery (in 1811) of a set of Sasquatch footprints . . . ." *Id.* Since then, "[v]isual sightings and even alleged photographs and filmings (notably by Roger Patterson at Bluff Creek,

Calif., in 1967) have also contributed to the legend." *Id.* However, "most scientists do not recognize the creature's existence." *Id.*

To execute his planned filming of Bigfoot, Doyle purchased a costume resembling an ape and then climbed the mountain with his girlfriend. At the top, he put on the Bigfoot costume and filmed conversations he had with other hikers. After about twenty minutes, he removed the costume and descended the mountain. On his way down, he encountered two park staff members, and persuaded them to write a note saying there had been a "Bigfoot sighting" on the mountain. The staff members later said they were just playing along with what they thought was a college project. After leaving the park, Doyle went to both the local police station and State Police in Keene to tell them that there had been a Bigfoot sighting on Mount Monadnock.

Pleased that his Bigfoot hoax resulted in hikers "interacting, laughing, and coming together as a community," Doyle decided to stage another Bigfoot event on the mountain. To raise awareness of his next appearance, he had a friend interview him about the first event and write a press release, which Doyle gave to the *Keene Sentinel*. The newspaper printed a story that said Doyle would again climb the mountain dressed as Bigfoot. Doyle also promoted this upcoming appearance on his website.

On September 17, 2009, the Monadnock State Park Manager, Patrick Hummel, sent an email to his supervisor, Brian Warburton, informing him of Doyle's activities. Hummel said that Doyle "never ran anything by [him]." He expressed annoyance over the fact that newspapers had called him to ask whether the Bigfoot story was legitimate. He also told Warburton that the Bigfoot party would soon return, and because he believed they had "stepped over the line" he would intercept them prior to their ascent.

On September 19, 2009, Doyle and five others returned to Mount Monadnock to stage another Bigfoot filming. They hiked up to the Halfway House, a trail junction, and prepared to perform. Doyle and two of his friends remained in plain clothes, while the others dressed up as Bigfoot, Yoda and a pirate. Doyle filmed a few scenes and interviewed passing hikers. Additionally, several people stopped to watch them filming.

Shortly thereafter, Hummel approached Doyle and asked him whether he had a special-use permit. Doyle said he did not, and Hummel told him that he had to leave the mountain. Doyle and his friends complied.

Under New Hampshire Administrative Rule, Res 7306.01(a), a person must obtain a special-use permit to use DRED properties for "[h]olding organized or special events which go beyond routine recreational activities." To obtain a permit, the applicant must apply for the permit at least thirty days prior to the event, pay a $100 fee and obtain a $2,000,000 insurance

policy that covers the State of New Hampshire. N.H. ADMIN. RULES, Res 7306.01 to .04. Once these requirements are met, DRED "shall approve [the] application." N.H. ADMIN. RULES, Res 7306.04(a).

Doyle subsequently brought a declaratory judgment action against DRED, arguing that Res 7306.01(a) violates the right to free speech contained in both Part I, Article 22 of the New Hampshire Constitution and the First Amendment to the United States Constitution. Doyle also sought a permanent injunction, nominal damages, costs and fees. The trial court granted summary judgment in favor of DRED, ruling that Doyle failed to show that Res 7306.01(a) "is unconstitutional either facially or as applied." On appeal, Doyle argues the trial court erred because Res 7306.01(a) is void for vagueness, overbroad on its face and not narrowly tailored, and also overbroad as applied to Doyle's small-scale project.

*I. Analysis*

Part I, Article 22 of our State Constitution provides: "Free speech and liberty of the press are essential to the security of freedom in a state: They ought, therefore, to be inviolably preserved." N.H. CONST. pt. I, art. 22. Similarly, the First Amendment to the United States Constitution prevents the passage of laws "abridging the freedom of speech." U.S. CONST. amend. I. It applies to the states through the Fourteenth Amendment to the United States Constitution. *Lovell v. Griffin*, 303 U.S. 444, 450 (1938).

We first address Doyle's claims under our State Constitution, *State v. Ball*, 124 N.H. 226, 231 (1983), and cite federal opinions for guidance only. *Id.* at 232-33. We review the constitutionality of state regulations *de novo*. *See N.H. Assoc. of Counties v. State of N.H.*, 158 N.H. 284, 288 (2009).

The speech at issue here is unquestionably protected under our State Constitution. Even though Doyle's activities may have been nothing more than a playful hoax, "[w]holly neutral futilities . . . come under the protection of free speech as fully as do Keats' poems or Donne's sermons." *United States v. Stevens*, 130 S. Ct. 1577, 1591 (2010) (quotation omitted; alterations in original). Only narrow categories of speech, such as defamation, incitement and pornography produced with real children, fall outside the ambit of the right to free speech. *See State v. Zidel*, 156 N.H. 684, 686 (2008). Furthermore, expression by means of motion pictures — which this plainly was — is protected speech, *State v. Theriault*, 158 N.H. 123, 127 (2008), as is performance art, *see Schad v. Mount Ephraim*, 452 U.S. 61, 65-66 (1981). We must, therefore, determine whether the permit scheme regulating Doyle's speech violates the right to free speech.

We first address Doyle's facial challenge. *See State v. Hynes*, 159 N.H. 187, 200 (2009). To prevail, Doyle must either establish: (1) that no set of

circumstances exists under which Res 7306.01(a) would be valid; or (2) that Res. 7306.01(a) is overbroad in that "a substantial number of its applications are unconstitutional, judged in relation to the [regulation's] plainly legitimate sweep." *Stevens,* 130 S. Ct. at 1587. Doyle focuses his challenge on the latter, overbreadth, and we thus limit our discussion accordingly.

To determine whether a substantial number of a regulation's applications are unconstitutional, we must scrutinize it under the applicable constitutional standard. As the Supreme Court has explained, "the standards by which limitations on speech must be evaluated differ depending on the character of the property." *Frisby v. Schultz,* 487 U.S. 474, 479 (1988) (quotation omitted). Thus, at the outset, we must analyze the character of the government property at issue.

Government property generally falls into three categories — traditional public forums, designated public forums and limited public forums. *Pleasant Grove City v. Summum,* 555 U.S. 460, 469-70 (2009). A traditional public forum is government property "which by long tradition or by government fiat [has] been devoted to assembly and debate." *Cornelius v. NAACP Legal Defense & Ed. Fund,* 473 U.S. 788, 802 (1985) (quotation omitted). In such forums, the government may impose reasonable time, place and manner restrictions. *Summum,* 555 U.S. at 469. If a restriction is content-based, it must be narrowly tailored to serve a compelling government interest. *Id.* If a restriction is content-neutral, it must satisfy a slightly less stringent test — it must be narrowly tailored to serve a *significant* government interest. *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989). Content-neutral restrictions, however, must also leave open ample alternative channels for communication. *Id.*

A designated public forum is government property "that the State has opened for expressive activity by part or all of the public." *International Soc. for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678 (1992). Regulations of speech on this type of property are "subject to the same limitations as that governing a traditional public forum." *Id.*

Finally, a limited public forum is government property "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Summum,* 555 U.S. at 470. Regulations of speech on this type of property are judged under a far more lenient standard — they need only be "reasonable and viewpoint neutral." *Id.*

During the superior court proceedings, DRED repeatedly asserted that Mount Monadnock is a traditional public forum. The trial court premised its ruling on DRED's representation, and Doyle relied on it. Operating on this assumption, neither party addressed the issue on appeal. We requested

supplemental memoranda on the issue, and DRED now argues that Mount Monadnock is either a limited public forum or a nonpublic forum. Doyle argues that it is a traditional public forum, which has been his position throughout this litigation.

We have long held that "we will not consider issues raised on appeal that were not presented in the lower court." *LaMontagne Builders v. Brooks*, 154 N.H. 252, 258 (2006) (quotation omitted). *But see* SUP. CT. R. 16-A (plain error rule). However, we have also held that "where the trial court reaches the correct result on mistaken grounds, we will affirm if valid alternative grounds support the decision." *State v. Nightingale*, 160 N.H. 569, 575-76 (2010) (quotation omitted).

It is at least arguable that the trial court here reached the correct result based upon the mistaken conclusion that Mount Monadnock is a traditional public forum. *See Boardley v. Dept. of Interior*, 615 F.3d 508, 515 (D.C. Cir. 2010) ("[M]any national parks include areas — even large areas, such as a vast wilderness preserve — which never have been dedicated to free expression and public assembly, would be clearly incompatible with such use, and would therefore be classified as nonpublic forums."). Thus, there may be a valid alternative ground to support its decision. Even so, we do not mechanically follow the "alternative grounds" rule. For example, in *State v. Santana*, 133 N.H. 798, 807-09 (1991), we declined to address an alternative ground for upholding the trial court's decision because the State did not raise the issue at trial and thus "the defendant . . . never had the opportunity to consider that legal issue or the development of facts that might or might not have supported [his] argument."

Here, there is equally good reason not to follow the alternative grounds rule. Because of DRED's representations at trial, Doyle had no reason to believe that there was any dispute as to whether Mount Monadnock is a traditional public forum, and thus no reason to develop the record to support such a ruling. Were we to now address DRED's argument, Doyle's reasonable reliance on DRED's representation would work to his detriment, while DRED's failure to address a legal issue at trial would now work to its advantage. Moreover, we prefer that issues like this be raised at trial "because trial forums should have a full opportunity to come to sound conclusions and to correct errors in the first instance." *Tiberghein v. B.R. Jones Roofing Co.*, 151 N.H. 391, 393 (2004) (quotation omitted). Accordingly, based upon DRED's representations at trial, we assume, without deciding, that Mount Monadnock is a traditional public forum and decline to independently examine the issue. *See Mahoney v. Doe*, 642 F.3d 1112, 1117-18 (D.C. Cir. 2011) (noting that the District of Columbia had conceded at trial that the 1600 block of Pennsylvania Avenue is a

traditional public forum and that, absent exceptional circumstances, the court would not consider issues not raised at trial).

■ Traditional public forums are fundamental to the continuing vitality of our democracy, for "time out of mind, [they] have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Boos v. Barry*, 485 U.S. 312, 318 (1988) (quotation omitted). As such, "government entities are strictly limited in their ability to regulate private speech in [traditional public forums]." *Summum*, 555 U.S. at 469. The parties here agree that the regulation at issue is content-neutral, and thus, as noted above, it must be narrowly tailored to serve a significant government interest. *Ward*, 491 U.S. at 791. Therefore, we must first determine whether a significant government interest underlies Res 7306.01(a) and, if so, whether it is narrowly tailored to achieve that interest.

### A. Significant Government Interest

■ DRED claims that the purpose of the regulation is to allow it to manage the varied and competing uses of park resources and to mitigate the impacts of commercial events. These interests are certainly significant. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992) ("[I]n order to regulate competing uses of public forums, [the government] may impose a permit requirement on those wishing to hold a march, parade, or rally . . . ."); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 299 (1984) ("[T]here is a substantial Government interest in conserving park property . . . .").

DRED also claims that it has a significant interest in protecting visitors from unwelcome or unwarranted interference, annoyance, or danger. It is unclear whether this constitutes a significant government interest. *Compare FCC v. Pacifica Foundation*, 438 U.S. 726, 749 n.27 (1978) ("Outside the home, the balance between the offensive speaker and the unwilling audience may sometimes tip in favor of the speaker, requiring the offended listener to turn away."), *and Coates v. City of Cincinnati*, 402 U.S. 611, 615 (1971) ("The First and Fourteenth Amendments do not permit a State to make criminal the exercise of the right of assembly simply because its exercise may be 'annoying' to some people."), *with Schaumburg v. Citizens for Better Environ.*, 444 U.S. 620, 636 (1980) (stating that the government has a substantial interest in protecting the public from "fraud, crime and undue annoyance"), *and State v. Brobst*, 151 N.H. 420, 424 (2004) ("Certainly the State has a legitimate interest in protecting citizens from the effects of certain types of annoying or alarming telephone calls, such as the terror caused to an unsuspecting person when he or she answers the telephone, perhaps late at night, to hear nothing but a tirade of threats,

curses, and obscenities, or, equally frightening, to hear only heavy breathing or groaning." (quotation omitted)). However, because we ultimately conclude that the regulation is not narrowly tailored, we assume, without deciding, that preventing such annoyance is a significant government interest.

*B. Narrowly Tailored*

Narrow tailoring is satisfied so long as the regulation promotes a significant government interest that would be achieved less effectively absent the regulation. *Ward*, 491 U.S. at 799. The regulation may not burden substantially more speech than is necessary to further the government's interest, but it "need not be the least restrictive or least intrusive means" of doing so. *Id.* at 798-99. Also, "[the] [g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.*

To determine whether the regulation meets this standard, we must first establish its scope. We ascribe the plain and ordinary meaning to regulatory text. *See Kenison v. Dubois*, 152 N.H. 448, 451 (2005). On its face, Res 7306.01(a) requires a permit for "organized or special events" that go "beyond routine recreational activities." These terms are not defined in the regulation and thus we look to WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (unabridged ed. 2002) for guidance.

WEBSTER'S defines "event" as "something that happens." *Id.* at 788. It defines "special" as "distinguished by some unusual quality," *id.* at 2186, and "organize," in relevant part, as "to arrange by systemic planning and coordination of individual effort," *id.* at 1590. Thus, "organized or special events" are happenings that are either coordinated and planned or unusual.

WEBSTER'S defines "routine" as "of a commonplace or repetitious character." *Id.* at 981. As such, "routine recreational activities" are those activities that are commonly or repeatedly done at the park. According to DRED and Mount Monadnock's website, those activities include camping, hiking, picnicking, Nordic skiing and snowshoeing.

We thus interpret Res 7306.01(a) to require a permit when a person does something that is either unusual or planned and is not one of the listed activities. As interpreted, the regulation applies to a broad range of people and types of speech.

As to people, the text of Res 7306.01(a) applies without regard to the number of people attending an event. Indeed, DRED has admitted that the "amount of people participating in the event does not affect whether it is considered an 'organized event.'" Therefore, the regulation applies equally

to large groups, small groups and even one person. This is problematic because "[p]ermit schemes and advance notice requirements that potentially apply to small groups are nearly always overly broad and lack narrow tailoring." *American-Arab Anti-Discrimin. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005); *accord Berger v. City of Seattle*, 569 F.3d 1029, 1037-40 (9th Cir. 2009); *Knowles v. City of Waco, Texas*, 462 F.3d 430, 436 (5th Cir. 2006); *Cox v. City of Charleston, SC*, 416 F.3d 281, 284-87 (4th Cir. 2005); *Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996); *Community for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1392 (D.C. Cir. 1990).

■ Here, requiring a permit for one person — for example, a lone protestor holding a sign at the top of the mountain — does not further DRED's interests. A one-person event will not require the allocation of competing park resources, nor is one person likely to cause any unwarranted or unwelcome annoyance. *See Boardley*, 615 F.3d at 522 ("The most important function of a permit application is to provide park officials with the forewarning necessary to coordinate multiple events, assemble proper security, and direct groups to a place and time where interference with park visitors and programs will be minimized. These needs arise routinely with large-scale events, but only rarely with small ones."); *Grossman v. City of Portland*, 33 F.3d 1200, 1207 (9th Cir. 1994) ("[W]e simply cannot agree that six to eight people carrying signs in a public park constituted enough of a threat to the safety and convenience of park users . . . to justify the [the permitting scheme at issue]."); *see also American-Arab Anti-Discrimin.*, 418 F.3d at 608 ("In most circumstances, the activity of a few people peaceably using a public right of way for a common purpose or goal does not trigger the [government's] interest in safety and traffic control."). It is primarily large groups that are likely to implicate these interests, for by their sheer size they are likely to cause annoyance and to put a large burden on park resources. *See Boardley*, 615 F.3d at 522.

Perhaps requiring very small groups to obtain permits would be constitutionally permissible where "the public space in question [is] so small that even a relatively small number of people could pose a problem of regulating competing uses." *Long Beach Area Peace v. City of Long Beach*, 574 F.3d 1011, 1034 (9th Cir. 2009). That is not, however, the case here — Mount Monadnock is quite large, and the permit requirement applies to the entire park. Furthermore, even if requiring a single person to obtain a permit would occasionally serve DRED's significant interests, "it does so at too high a cost, namely, by significantly restricting a substantial quantity of speech that does not impede [DRED's] permissible goals." *Community for Creative Non-Violence v. Turner*, 893 F.2d at 1392.

As to types of speech, Res 7306.01(a) applies to a wide range of speech that has no relation to DRED's significant interests. For example, it would apply to a church group of just six people who organized a hike up the mountain to hold a short, private prayer service at the summit. This event would be unlikely to cause any disturbance or annoyance to park visitors. And, six people praying on the mountain would have a *de minimis* effect, if any, on park resources.

■ More troubling is that this regulation needlessly stifles political speech, an integral component to the operation of the system of government established by our Constitution. *See Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (construing the Federal Constitution). For example, if a group of three people supporting a political candidate were to climb the mountain and walk around the summit with campaign signs, they would need a permit. This event is special — it is not every day that political supporters climb the mountain to spread their message, and organizing on the mountain for a political purpose is plainly not a routine recreational activity. Requiring a permit for such an event is wholly unnecessary — a group of three people carrying signs will hardly burden park resources and will not likely cause unwelcome or unwarranted annoyance. Res 7306.01(a), therefore, burdens substantially more speech than is necessary to serve DRED's interests. *Ward*, 491 U.S. at 799.

Beyond the broad coverage of people and types of speech, Res 7306.01(a)'s thirty-day notice requirement raises additional constitutional concerns. Courts have held that similar (and shorter) notice periods violate the right to free speech. *See, e.g., American-Arab Anti-Discrimin.*, 418 F.3d at 605-07 (striking down a thirty-day notice requirement because it was overly expansive and not narrowly tailored); *Church of the Amer., Ku Klux Klan v. City of Gary, IN*, 334 F.3d 676, 683 (7th Cir. 2003) (holding that a "45-day period selected by the City of Gary and made applicable to all permit seekers whether or not any danger of violence is perceived is arbitrary" and, therefore, violates the right to free speech); *Douglas*, 88 F.3d at 1524 ("The five-day notice requirement restricts a substantial amount of speech that does not interfere with the city's asserted goals of protecting pedestrian and vehicle traffic, and minimizing inconvenience to the public. Accordingly, we conclude that the parade ordinance is not narrowly tailored."); *N.A.A.C.P., Western Region v. City of Richmond*, 743 F.2d 1346, 1357 (9th Cir. 1984) ("[W]e hold that the City of Richmond's requirement of 20 days' advance notice to receive a parade permit violates the First Amendment.").

■ Indeed, advance notice requirements for traditional public forums typically survive constitutional attack only when they require no more than

several days' notice. *See, e.g., Santa Monica Food Not Bombs v. Santa Monica*, 450 F.3d 1022, 1045 (9th Cir. 2006) (holding that a "two-day notice [requirement], on its face, is sufficiently narrowly tailored"); *A Quaker Action Group v. Morton*, 516 F.2d 717, 735 (D.C. Cir. 1975) ("[W]e approve the existing provision requiring applicants to apply for a permit at least 48 hours in advance of a planned public gathering."); *Loc. 32B-32J, Serv Emp. Intern v. Port Auth. of NY*, 3 F. Supp. 2d 413, 422 (S.D.N.Y. 1998) (upholding a thirty-six-hour advance notice requirement). *But see Thomas v. Chicago Park Dist.*, 227 F.3d 921, 925-26 (7th Cir. 2000), *aff'd on other grounds*, 534 U.S. 316 (2002) (upholding thirty-day notice requirement for general use of park and sixty-day requirement for use of special park facilities because "since thousands of permit applications are filed with the park district every year, it would be burdensome to require the park to process the applications in a significantly shorter time" and the park's policy also permitted " 'spontaneous' rallies in reaction to current events").

Underpinning some of these holdings is the observation that because state officials are often deployed on short notice there is no reason to require long notice periods. *See Douglas*, 88 F.3d at 1524; *City of Richmond*, 743 F.2d at 1357. Mount Monadnock is no different. Park officials may need thirty days' notice to coordinate large events. *See Boardley*, 615 F.3d at 522. However, as evidenced by the facts of this case, park officials can respond to small incidents quite quickly. The thirty-day notice requirement is thus not narrowly tailored, for it requires thirty days' notice in many cases in which park officials could accommodate speakers on much shorter notice. *See Vodak v. City of Chicago*, 639 F.3d 738, 749 (7th Cir. 2011) ("[T]he time required to consider an application will generally be shorter the smaller the planned demonstration . . . ." (quotation omitted)); *Boardley*, 615 F.3d at 522.

■ The advance notice requirement is also problematic because it contains no exception for spontaneous expression. *See Santa Monica Food Not Bombs*, 450 F.3d at 1047 ("[T]o comport with the First Amendment, a permitting ordinance must provide some alternative for expression concerning fast-breaking events."); *Church of the Amer., Ku Klux Klan v. City of Gary, IN*, 334 F.3d at 682 ("[A] very long period of advance notice with no exception for spontaneous demonstrations unreasonably limits free speech."). Spontaneous expression may be vital to a speaker's message because "[a] spontaneous [event] expressing a viewpoint on a topical issue will almost inevitably attract more participants and more press attention, and generate more emotion, than the 'same' [event] [3]0 days later." *Vodak*, 639 F.3d at 749 (quotation omitted).

Accordingly, Res 7306.01(a) is nothing more than "a blanket rule requiring [a] permit application to be made in all cases no fewer than thirty days prior to an intended [event]." *Sullivan v. City of Augusta*, 511 F.3d 16, 39 (1st Cir. 2007). The right to free speech does not permit such a panoptic regulation because, far from being narrowly tailored, it applies in numerous circumstances that have no relation to DRED's significant interests.

*II. Conclusion*

▆▆ The foregoing demonstrates that Res 7306.01(a) is unconstitutional in a substantial number of its applications and is thereby overbroad. Therefore, on its face Res 7306.01(a) violates the right to free speech guaranteed by Part I, Article 22 of our State Constitution, and we thus need not address Doyle's remaining arguments, including his arguments under the Federal Constitution. *See Ball*, 124 N.H. at 237.

Our holding today, however, is a narrow one. It rests on the assumption that Mount Monadnock is a traditional public forum, an assumption based upon the procedural posture of this case. We note that it is possible that the regulation at issue here could be permissible as applied to DRED properties that are not traditional public forums, and that in any event DRED may adopt regulations consistent with the right to free speech, which will require DRED to take into account the character of the property it regulates.

*Reversed and remanded.*

DALIANIS, C.J., and HICKS, CONBOY and LYNN, JJ., concurred.