NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

9th Circuit Court – Manchester District Division
No. 2012-781


THE STATE OF NEW HAMPSHIRE

v.

CATHERINE BAILEY & a.

Argued: March 5, 2014
Opinion Issued: August 8, 2014


Joseph A. Foster, attorney general (Lisa L. Wolford, assistant attorney general, on the brief and orally), for the State.


NH Civil Liberties Foundation, of Concord (Barbara R. Keshen on the brief), and Nixon, Vogelman, Barry, Slawsky & Simoneau, PA, of Manchester (Lawrence A. Vogelman orally), for the defendants.


CONBOY, J. The defendants, Catherine Bailey, Rhylan Bruss, Benjamin DiZoglio, Elizabeth Edwards, Elizabeth Grunewald, Charlene Higgins, William Hopkins, Michael Joseph, Brian Kelly, Matthew Lawrence, Keith Martin, Christian Pannapacker, Tara Powell, Matthew Richards, Katheryn Talbert, and Leah Wolczko, appeal a ruling of the Circuit Court (Lyons, J.) that they violated a City of Manchester ordinance establishing a park curfew of 11:00 p.m. to 7:00 a.m. See Manchester, N.H., Code of Ordinances § 96.04 (2010); RSA

47:17 (2012). The defendants argue that this ruling amounts to an unconstitutional infringement of their free speech rights. We affirm.

I

The following facts are drawn from the trial court order on the defendants' motion to dismiss or are otherwise supported by the record. In October 2011, the defendants were participating in a movement known nationally as Occupy Wall Street. They participated in the movement in Manchester, operating under the name Occupy New Hampshire. One defendant explained that "[o]ccupy is a tactic. Occupy means staying in one place until your grievances are addressed." The individual participants in Occupy New Hampshire had a broad range of grievances or issues, including ending the involvement of the United States in foreign wars, eliminating the Federal Reserve, limiting the influence of money on elected officials, protesting the lack of jobs, challenging bank bailouts, and eliminating inequality in the distribution of wealth.

On October 15, more than 300 Occupy New Hampshire participants met at Veteran's Park, a city park in Manchester. Because the participants learned that the police were holding a benefit at Veteran's Park, they began their "occupation" in Victory Park instead. Approximately forty people stayed overnight in ten to fifteen tents. Prior to meeting at the park, the participants had formed several committees to manage the group, including a safety committee responsible for cleaning the park and mediating disagreements, and a logistics committee responsible for addressing the participants' needs relating to such items as food, tents, and clothing. They set up portable toilets and arranged for participants to shower in nearby homes. The group also established policies prohibiting littering and the use of drugs and alcohol. The police conveyed one noise complaint to the group due to drumming, after which the participants established internal rules for when they would use drums.

Two days later, the participants relocated to Veteran's Park, where twenty-five to thirty people in approximately ten tents occupied less than twenty percent of the park. As in Victory Park, they set up portable toilets, and designated tents for the various committees. The participants intended to remain encamped until their grievances were heard.

On October 19, shortly after 11 p.m., the Manchester police told the people present in the park that the police would enforce the park curfew ordinance and asked those present to leave. The defendants declined to do so and received summonses for violating Manchester City Ordinance § 96.04, which the parties represent states in relevant part: "Parks shall be closed to the public every day of the year from 11:00 p.m. until 7:00 a.m., except for

2

such functions as fireworks displays and such other community programs as may be authorized by the Public Works Director, or his or her designee."

The defendants moved to dismiss the charges against them, arguing, in part, that the "application of the criminal law to their protected rights to free speech" violated the New Hampshire and Federal Constitutions. The court conducted a hearing, after which it denied the defendants' motion and found the defendants guilty. This appeal followed.

II

The defendants argue that application of the park curfew ordinance suppressed their expressive activity, which, they contend, is protected under Part I, Article 22 of the New Hampshire Constitution and the First Amendment to the United States Constitution. This argument presents a question of constitutional law, which we review de novo. State v. Biondolillo, 164 N.H. 370, 373 (2012).

Part I, Article 22 provides: "Free speech and liberty of the press are essential to the security of freedom in a state: They ought, therefore, to be inviolably preserved." N.H. CONST. pt. I, art. 22. Similarly, the First Amendment prevents the passage of laws "abridging the freedom of speech." U.S. CONST. amend. I. It applies to the states through the Fourteenth Amendment to the United States Constitution. Lovell v. Griffin, 303 U.S. 444, 450 (1938). We first address the defendants' claims under the State Constitution, and rely on federal law only to aid in our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983).

Although the State Constitution contains robust guarantees of free speech, it does not offer absolute protection to all speech under all circumstances and in all places. Biondolillo, 164 N.H. at 373. When assessing whether government restrictions impermissibly infringe on free speech, we "(1) assess whether the conduct or speech at issue is protected by the [State Constitution], (2) identify the nature of the forum in order to determine the extent to which the government may limit the conduct or speech, and then (3) assess whether the justifications for restricting the conduct or speech satisfy the requisite standard." Watters v. Otter, 854 F. Supp. 2d 823, 828 (D. Idaho 2012); see Cornelius v. NAACP Legal Defense & Ed. Fund, 473 U.S. 788, 797 (1985); Doyle v. Comm'r, N.H. Dep't of Resources & Economic Dev., 163 N.H. 215, 220-27 (2012). We address each step in turn.

A

Part I, Article 22 expressly preserves the right to free speech. Although we do not accept "the view that an apparently limitless variety of conduct can

be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea, we . . . acknowledge[] that conduct may be sufficiently imbued with elements of communication to fall within the scope of [constitutional protections]." Texas v. Johnson, 491 U.S. 397, 404 (1989) (quotations and citation omitted); see State v. Comley, 130 N.H. 688, 691 (1988) (noting that although statute did not specifically regulate speech, its application "may have such an effect where a prosecution under the statute concerns conduct encompassing expressive activity").

On appeal, the State urges us to "review the threshold question of whether the defendants' activity constituted protected speech," even though this was not raised in the trial court. This we decline to do. The defendants argued to the trial court that their encampment in Veteran's Park "was a symbolic expression of the possibility of a more democratic, just and economically egalitarian society" and, therefore, warranted constitutional protection. The trial court implicitly adopted this position, noting that "[t]he defendants argue and the State does not dispute that as applied, the enforcement action . . . encompass[ed] expressive speech." "We have long held that we will not consider issues raised on appeal that were not presented in the [trial] court." Doyle, 163 N.H. at 222 (quotation omitted); see also State v. Boyle, 148 N.H. 306, 309 (2002). Consequently, we will assume, without deciding, that the defendants engaged in constitutionally protected expressive conduct. See Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984) (assuming, but not deciding, that overnight sleeping in connection with demonstration was constitutionally protected expressive conduct).

B

"[I]t is . . . well settled that the government need not permit all forms of speech on property that it owns and controls." International Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678 (1992). "[T]he standards by which limitations on speech must be evaluated differ depending on the character of the property." Doyle, 163 N.H. at 221 (quotation omitted). Government property generally falls into three categories — traditional public forums, designated public forums, and limited public forums. Id. "A traditional public forum is government property which by long tradition or by government fiat has been devoted to assembly and debate." Id. (quotation and brackets omitted); see also International Soc. for Krishna Consciousness, Inc., 505 U.S. at 679.

The events at issue occurred in Veteran's Park, which is a Manchester city park. The parties agree that Veteran's Park is a traditional public forum. Thus, we will assess whether the justification for restricting the defendants' conduct satisfies the requisite standard for traditional public forums.

4

## C

As we have previously stated, under the State Constitution the right of free speech

> may be subject to reasonable time, place and manner regulations that are content-neutral, narrowly serve a significant governmental interest, and allow other opportunities for expression.  Even where a law regulates conduct generally, without addressing speech in particular, it nonetheless may effect an incidental regulation of speech that, like direct regulation, is constitutionally permissible if it does not exceed the bounds of the limited, content-neutral time, place and manner standard.

Biondolillo, 164 N.H. at 373 (quotation omitted); see also Doyle, 163 N.H. at 221.  We note that "[f]ederal precedent employs the same standard to assess the constitutionality of restrictions on the time, place, and manner of expressive activities taking place in a public forum."  Biondolillo, 164 N.H. at 373; see McCullen v. Coakley, 134 S. Ct. 2518, 2529 (2014) ("[T]he government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication . . . ." (quotations omitted)).

The defendants argue that "Part I, Article 22 of the New Hampshire Constitution is more protective of civil liberties than the First Amendment" and encourage us to apply the "strict scrutiny test, in which the government must show a compelling State interest in order for its actions to be valid." (Quotation omitted.)  We have not previously construed Part I, Article 22 of the New Hampshire Constitution to be more protective than the First Amendment of the United States Constitution in the context of time, place, and manner restrictions.  Rather, we have employed the same standard to assess the constitutionality of these types of restrictions as is used under the Federal Constitution.  See Biondolillo, 164 N.H. at 373; Doyle, 163 N.H. at 221.  Given our precedent, we decline the defendants' invitation to broaden our standard.

Thus, to be valid, the park curfew ordinance must be a reasonable time, place, and manner restriction.  See Doyle, 163 N.H. at 221.  "If [the] restriction is content-based, it must be narrowly tailored to serve a compelling government interest."  Id.  "If [the] restriction is content-neutral, it must satisfy a slightly less stringent test — it must be narrowly tailored to serve a significant government interest" and must "leave open ample alternative channels for communication."  Id.

5

The defendants concede that the park curfew ordinance is content-neutral on its face. They also concede that the ordinance advances significant government interests, including "the general public's enjoyment of park facilities, the viability and maintenance of those facilities, the public's health, safety, and welfare, as well as the protection of city parks and public property from overuse and unsanitary conditions." The defendants argue, however, that the park curfew ordinance, as applied to them, is not narrowly tailored to serve these significant government interests. They contend that they "took into account each of the government interests in planning and executing the occupation." They highlight their willingness to accommodate competing uses of the park by beginning the occupation in Victory Park; their concern for public safety and welfare by enforcing a no drugs or alcohol policy and patrolling the park to prevent assaults and disruptions; and their attention to maintaining the park facilities with clean-up details that "left the park in better shape than when they found it." Consequently, they argue that "[t]here was no need to apply the ordinance to [their] constitutionally protected activity in order to protect the government's interest in the park." We disagree.

"[T]he requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989) (quotation and ellipsis omitted). There is no doubt that Manchester may restrict the hours that city parks are open as a means of achieving the governmental interests in protecting public safety and welfare and maintaining the condition of the parks. See Clark, 468 U.S. at 298-99 ("No one contends that aside from its impact on speech a rule against camping or overnight sleeping in public parks is beyond the constitutional power of the Government to enforce."); Peters v. Breier, 322 F. Supp. 1171, 1172 (E.D. Wis. 1971) (concluding park curfew was facially constitutional where it "defines the area that is restricted and the hours of the curfew" and "provides for appropriate notice"); cf. People v. Trantham, 208 Cal. Rptr. 535, 544 (App. Dep't Super. Ct. 1984) (upholding, as reasonable, late night park closure regulation and finding "its proscription against anyone entering, remaining, staying, or loitering in any park during the late night hours . . . is not void for vagueness or overbreadth").

The defendants' argument suggests that the city was required to make an exception to an otherwise legitimate regulation because they were "thoughtful and considerate in their use of the park," "accommodate[d] competing uses of the park," and made arrangements to avoid "negatively affect[ing] the public's health, safety and welfare while they were in the park." We cannot conclude, however, that the city is required to determine, on a case-by-case basis, whether its significant interests in implementing a time, place, and manner restriction are likely to be affected. "Plausible public policy arguments might well be made in support of [requiring] such [an] exception,

but it by no means follows that it is therefore constitutionally mandated, nor is it clear that . . . the suggested exception[] would even be constitutionally permissible." City Council v. Taxpayers for Vincent, 466 U.S. 789, 815-16 (1984) (citation omitted) (concluding that, although arguments could be made that exceptions to city ordinance prohibiting posting signs on public property — such as for signs carrying certain types of messages — would have lessened severity of impact on expressive activity, such exceptions were not constitutionally mandated).  Determining, on an ad hoc basis, whether a specific individual or group poses a threat to the city's interests in maintaining the park curfew could vest unbridled discretion in a decision-maker and, consequently, create a risk of granting exceptions to favored speakers.  See Montenegro v. N.H. Div. of Motor Vehicles, 166 N.H. ___, ___ (decided May 7, 2014) ("[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." (quotation omitted)); see also Forsyth County v. Nationalist Movement, 505 U.S. 123, 133 (1992).  We cannot condone such an outcome.  See Thomas v. Chicago Park Dist., 534 U.S. 316, 323 (2002) ("Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content."); Taxpayers for Vincent, 466 U.S. at 816 ("To create an exception for appellees' political speech and not these other types of speech might create a risk of engaging in constitutionally forbidden content discrimination.").

Moreover, "the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." Ward, 491 U.S. at 801; see also Heffron v. Int'l Soc. for Krishna Consc., 452 U.S. 640, 654 (1981) (noting that inquiry into rule's constitutionality "must involve not only [the respondents], but also all other organizations that would be entitled to [act] if the . . . rule may not be enforced with respect to [the respondents]").  In Clark, the United States Supreme Court considered "whether a National Park Service regulation prohibiting camping in certain parks violate[d] the First Amendment when applied to prohibit demonstrators from sleeping in Lafayette Park and the Mall in connection with a demonstration intended to call attention to the plight of the homeless." Clark, 468 U.S. at 289.  The Court concluded that the First Amendment did not invalidate the regulation, noting that "[a]bsent the prohibition on sleeping, there would be other groups who would demand permission to deliver an asserted message by camping in Lafayette Park[,] . . . and the denial of permits to . . . others would present difficult problems for the Park Service." Id. at 297.  The Court determined that the regulation served the government's interest — "maintaining the parks . . . in an attractive and intact condition" — because "[w]ith the prohibition . . . at least some around-the-clock demonstrations . . . will not materialize, [and] others will be limited in size and duration." Id. at 296, 297.  The Court explained that the regulation survived constitutional scrutiny in part because

7

"the parks would be more exposed to harm without the sleeping prohibition than with it." Id. at 297.

A similar analysis applies here. The inquiry as to whether Manchester's park curfew ordinance is constitutional must involve not only the defendants, but all other groups or individuals that would be entitled to use the park if the ordinance were not enforced with respect to the defendants. Looked at in this way, the potential impacts from overnight occupation would make it difficult for the city to achieve its interest in protecting public safety and welfare and maintaining the condition of the parks. We find unavailing the defendants' argument that they should have been allowed to use the park overnight because "they [we]re engaged in constitutionally protected expression." "All those who would resort to the park[] must abide by otherwise valid rules for [its] use, just as they must observe the traffic laws, sanitation regulations, and laws to preserve the public peace." Id. at 298. Because it is agreed that the city has a significant interest in ensuring that its parks are adequately protected, and because that interest would be less efficiently achieved without the park curfew than with it, the regulation satisfies the requirement of narrow tailoring. See Ward, 491 U.S. at 799.

D

The defendants also argue that enforcing the park curfew ordinance was improper, as applied to them, because it did not leave open ample alternative channels for communication. They argue that their continuous presence in the park was necessary to communicate their message. They assert that they could not, using only the parks' hours of operation, "actually establish the kind of egalitarian, transparent democratic government that they aspire for [the] country." We disagree with the defendants' argument that the alternative channels for communication available to them were insufficient to communicate their message.

The defendants press a two-pronged argument. First, they argue that "[u]tilizing [an] alternative channel for communication would [have] require[d] setting up tents in the park . . . each morning at 7 a.m. and then taking them down and reassembling them on the adjoining sidewalk at 11 p.m." Then they argue that the sidewalk was "not a viable alternative channel of communication" because they potentially would have been "subject . . . to arrest under the criteria enunciated in Albers for blockage of the sidewalk or interference with traffic." See State v. Albers, 113 N.H. 132, 137-38 (1973); see also Gresham v. Peterson, 225 F.3d 899, 906 (7th Cir. 2000) ("[A]n alternative must be more than merely theoretically available. It must be realistic as well.").

8

"The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time." Albers, 113 N.H. at 138 (quotation omitted). The defendants were able to communicate their message in the manner that they wished during the sixteen hours the park was open. As to the eight hours when the park was closed, we cannot conclude that the inability of the petitioners to occupy the park constituted an unreasonable restriction on their protected speech. Although utilizing another forum to communicate their message during the park curfew may have inconvenienced the defendants, they were not constitutionally entitled to their "first or best choice, or one that provides the same audience or impact for the speech." Gresham, 225 F.3d at 906 (citation omitted).

The defendants' argument based upon Albers does not persuade us otherwise. In Albers, we considered the constitutionality of a statute penalizing failure "to withdraw from a mob action," where mob action was defined as "the assembly of two or more persons to do an unlawful act." Albers, 113 N.H. at 133 (quotation omitted). We acknowledged that the State's interests in enforcing the statute included "the prevention of . . . interference with traffic, blockage of sidewalks or entrances to buildings, and disruption of the normal functions of the public facility." Id. at 137-38 (quotation omitted). However, we did so in the context of a statute whose purpose "was to proscribe the assembly of persons for the specific purpose of engaging in 'imminent lawless action.'" Id. at 136. We concluded that "the statute aims merely to punish the abuse of right and subjects the speaker to no restraint of indispensable right. It aims at abuses." Id. at 139. (quotation and ellipses omitted). Nothing in Albers implies that citizens would be subject to arrest when communicating on public streets or sidewalks in ways that do not otherwise violate valid laws or regulations. Such a position would be contrary to the well settled principle that, "[c]onsistent with the traditionally open character of public streets and sidewalks, . . . the government's ability to restrict speech in such locations is 'very limited.'" McCullen, 134 S. Ct. at 2529. Of course, however, we can make no advance ruling as to the constitutionality of any particular potential activity; any decision on that issue would hinge on the specific facts and circumstances of such future conduct.

Consequently, we hold that Manchester satisfied the requirement that alternative channels of communication remain open to the defendants even though those channels may have been less effective for their purposes than those which the defendants would have preferred. See Coalition for Abolition of Mar. v. City of Atlanta, 219 F.3d 1301, 1319 (11th Cir. 2000) (recognizing that city could "satisfy the requirement that alternative channels of communication remain open to [the plaintiff] even if those channels may be less effective than [the plaintiff] would prefer" (quotation omitted)).

9

The foregoing demonstrates that Manchester City Ordinance § 96.04(A), as applied to the defendants, is valid under Part I, Article 22 of our State Constitution as a reasonable regulation of the time, place, and manner in which the city's parks may be used. Because the Federal Constitution offers the defendants no greater protection than the State Constitution in these circumstances, see Biondolillo, 164 N.H. at 376; McCullen, 134 S. Ct. at 2529, we reach the same conclusion under a federal analysis.

Affirmed.

DALIANIS, C.J., and HICKS, LYNN, and BASSETT, JJ., concurred.