NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

9th Circuit Court–Nashua Family Division
No. 2019-0132

IN RE A.D.

Submitted: June 18, 2019
Opinion Issued: July 26, 2019

Bianco Professional Association, of Concord (Crystal M. Maldonado and Thomas P. Colantuono on the brief), for the petitioner.

Gordon J. MacDonald, attorney general (Laura E. B. Lombardi, senior assistant attorney general, on the brief), for New Hampshire Division for Children, Youth and Families.

HICKS, J. The petitioner, Cynthia Marie Clark, appeals an order of the Circuit Court (Quigley, J.) dismissing her petition to adopt the four-year-old child, A.D. We affirm.

The following facts were found by the trial court, relate the contents of documents submitted as part of the appellate record, or are undisputed. The petitioner and the child are not related. In November 2014, when the child was approximately two months old, the New Hampshire Division for Children, Youth and Families (DCYF) removed her from the custody of her mother. The child was placed with the petitioner to provide foster care. DCYF filed a neglect petition against the child's biological parents, and, according to the petitioner and apparently not disputed by DCYF, in December 2014, the parents were

adjudicated to have neglected the child. Legal custody of the child was awarded to DCYF.

In April 2016, the child was reunited with her mother with whom she resided until December 2016. During that time, the petitioner sometimes babysat the child. Pursuant to court orders, the child's father was allowed to have only supervised visitation with the child; those visits were to be arranged through, and supervised by, a parent aide. However, unbeknownst to DCYF, while babysitting the child, the petitioner allowed the child's father to visit and stay overnight.

In September, the child's father informed the petitioner that he believed that the child was not safe with the mother and that he wanted to be reunited with the child. Although the petitioner, as a social worker, was a mandatory reporter, she did not contact DCYF about the father's safety concerns. Rather, unbeknownst to DCYF, she began a personal relationship with the father who, at the time, was 19 while the petitioner was 47 years old. Text messages between the petitioner and the child's father indicate that he was a regular visitor to the petitioner's home and that he was involved in her personal life. In one message, the child's father told the petitioner that he "want[ed] . . . a future" with her, that he loved her, and that he planned to "have a baby and get married" to her.

In December, the child was removed from her mother's care and was again placed with the petitioner for foster care. A permanency hearing in the parents' ongoing neglect case was scheduled to take place in March 2017. Shortly before it took place, DCYF learned of the relationship between the petitioner and the child's father. DCYF informed the court, and the court ordered that the child be removed from the petitioner's care and placed with another foster family. The child was placed with another foster family that day.

In June 2017, approximately three months after the child was removed from her care and before the parental rights of the child's parents had been terminated, the petitioner filed a petition to adopt the child. Her petition was held in abeyance pending the termination of the parental rights of the child's parents, which occurred in December 2017. After the parents' parental rights were terminated, DCYF became the child's legal guardian. See RSA 170-C:11, II (2014).

In January 2018, the court ordered a home study to be submitted, as required by RSA 170-B:18 (Supp. 2018). DCYF objected, asserting that the petitioner lacks "standing to file for adoption" because she is not related to the child and because, as of January 2018, it had been approximately ten and one-half months since the child had resided with her. DCYF further asserted that the petitioner had "failed to obtain the surrenders required by RSA 170-B:5," and that DCYF did "not agree to surrender its legal rights as the legal guardian

2

over [the child] and [would] not be executing a surrender." DCYF contended that the petitioner's adoption of the child would not be in the child's best interest. In response, the petitioner filed a copy of a home study that had been conducted in 2014, when she was first seeking to become a foster parent.

The court held two hearings. At the first hearing in June 2018, it heard arguments on standing. Thereafter, it allowed the parties to file memoranda on that issue. At the second hearing in September 2018, the court informed the parties that it would allow them to argue the standing issue, and then, if it deferred that issue or ruled that the petitioner had standing, it would allow them to present evidence on whether the petitioner's adoption of the child was in the child's best interest. Although the petitioner's counsel stated that she thought the hearing had been noticed "for the issue of standing," she acknowledged that she had brought witnesses and was "ready to argue . . . everything." She further acknowledged that she had brought to the hearing "five copies" of all of her exhibits. Following argument, the court deferred ruling on the standing issue and allowed the parties to present their evidence regarding whether the adoption was in the child's best interest.

In November, the trial court dismissed the petitioner's petition to adopt the child on the ground that the petitioner lacks standing. The court observed that the child had never been placed with the petitioner "for the purposes of adoption," that she had been removed from the petitioner's care "for cause," and that the child had not been in the petitioner's care and custody "for a year and a half." The petitioner unsuccessfully moved for reconsideration. Thereafter, the petitioner asked the court to stay any adoption of the child. In granting the stay, the court observed that "[t]here is another petition to adopt [the child] that has been filed by prospective adoptive parents with the consent of DCYF," and that DCYF "intends to surrender any legal rights it has prior to the petition being considered." This appeal followed.

On appeal, the petitioner first argues that the trial court erred by dismissing her adoption petition on the ground that she lacks standing. When, as in this case, a motion to dismiss does not contest the sufficiency of the petitioner's legal claim, but instead challenges the petitioner's standing to sue, the trial court must look beyond the allegations and determine, based upon the facts, whether the petitioner has sufficiently demonstrated a right to claim relief. In the Matter of Chrestensen & Pearson, 172 N.H. ___, ___ (decided March 8, 2019) (slip op. at 2-3). When the relevant facts are not in dispute, we review the trial court's standing determination de novo. Id. at ___ (slip op. at 3).

Adoption is wholly statutory. In re Sky D., 138 N.H. 543, 545 (1994). Accordingly, the determination of whether the petitioner has standing to petition to adopt the child "is a matter of statutory construction." O'Brien v. NH Democratic Party, 166 N.H. 138, 142 (2014) (quotation omitted). We review

the trial court's statutory interpretation <u>de</u> <u>novo</u>. <u>See</u> <u>id</u>. In matters of statutory interpretation, we are the final arbiter of the legislature's intent as expressed in the words of the statute considered as a whole. <u>Id</u>. When interpreting statutes, we ascribe the plain and ordinary meanings to the words used. <u>Id</u>. "We interpret statutes to give meaning to every word and phrase." <u>Id</u>. (quotation omitted). "Our goal is to apply statutes in light of the legislature's intent in enacting them and in light of the policy sought to be advanced by the entire statutory scheme." <u>Id</u>. (quotation omitted). When interpreting two statutes that deal with a similar subject matter, we construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statutes. <u>Chrestensen</u>, 172 N.H. at ___ (slip op. at 3).

The petitioner contends that she has standing to petition to adopt the child either because she is an unmarried adult and, as such, is statutorily-eligible to adopt children, <u>see</u> RSA 170-B:4, II (2014), or because she is the child's "psychological parent." We agree with the petitioner that she had standing to file the petition to adopt because she is an unmarried adult. In light of that decision, we need not decide whether being a prospective adoptee's "psychological parent" confers standing to adopt. Nor need we decide whether, as the petitioner argues, the trial court erred when it found that she is not the child's psychological parent or when it declined to reopen the record to allow her to submit expert testimony on that subject.

RSA 170-B:4 (2014) "lists categories of individuals who are eligible to adopt." <u>In re J.W.</u>, 172 N.H. ___, ___ (decided July 3, 2019) (slip op. at 2). The statute specifically provides that "[a]n unmarried adult" may adopt. RSA 170-B:4, II. Given the plain meaning of this statute, we conclude the petitioner "is plainly eligible to adopt," meaning that she has standing to bring an adoption petition. <u>In re Y.L.</u>, 171 N.H. 99, 100 (2018).

Although, as an unmarried adult, the petitioner is eligible to adopt, and thus, has standing to do so, we, nonetheless, uphold the trial court's dismissal of her petition on another ground. <u>See</u> <u>Doyle v. Comm'r, N.H. Dep't of Resources & Economic Dev.</u>, 163 N.H. 215, 222 (2012) (noting that "where the trial court reaches the correct result on mistaken grounds, we will affirm if valid alternative grounds support the decision" (quotation omitted)). Here, as DCYF correctly argues, dismissal of the petitioner's petition to adopt was proper because she "did not meet the statutory conditions to adopt an unrelated minor child."

As we recently explained, "the circuit court cannot grant a petition to adopt unless the statutory requirements for adoption are met." <u>In re J.W.</u>, 172 N.H. at ___ (slip op. at 9). One such requirement concerns the consent of the biological parents. <u>Id</u>. at ___ (slip op. at 9); <u>see</u> RSA 170-B:5 (2014). Generally speaking, consent to adoption "takes the form of a surrender of parental rights

4

executed in accordance with the statutory requirements." In re J.W., 172 N.H. at ___ (slip op. at 9). The consent of the biological parents need not be obtained, however, when, as in this case, their parental rights have already been terminated by court order. See RSA 170-B:7 (2014); see also In re J.W., 172 N.H. at ___ (slip op. at 9).

When the parental rights of the biological parents have been terminated and DCYF has been made the child's legal guardian, DCYF's consent to the adoption is required. See RSA 170-B:5, I(e) (requiring surrender of parental rights from DCYF when it has been given "the care, custody, and control of the adoptee, including the right to surrender"); see also RSA 170-C:11, II (2014) (providing that, once a court terminates the parental rights of the biological parents, DCYF or "another authorized agency" is appointed as the child's guardian and is vested with legal custody); RSA 170-C:2, V(d) (2014) (defining "guardianship" in this context as "the duty and authority to make important decisions in matters having a permanent effect" on the child, including "the authority to consent to the adoption of the child"). Thus, in order for the petitioner's adoption of the child to take place, DCYF must consent to it by surrendering its "care, custody, and control of the child" to the petitioner. RSA 170-B:2, XVII (2014) (defining a "surrender"), :5, I(e).

Here, it is undisputed that DCYF has not executed, and does not intend to execute, a surrender. Under those circumstances, "the statutory requirements for adoption are not met." In re J.W., 172 N.H. at ___ (slip op. at 10). Accordingly, we hold that dismissal of the petitioner's adoption petition was proper. See id. at ___ (slip op. at 10). We need not address the petitioner's remaining appellate arguments because they are moot.

Affirmed.

LYNN, C.J., and BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.